105 N.J. Super. 104 (1969)
251 A.2d 295
CONSOLIDATION COAL CO., ET AL., PETITIONERS,
v.
ROSCOE P. KANDLE, COMMISSIONER, ET AL., RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 17, 1968.
Decided March 13, 1969.
*107 Before Judges GOLDMANN, KILKENNY and CARTON.
Mr. Theodore W. Geiser argued the cause for petitioners (Messrs. Pindar, McElroy, Connell & Foley and Messrs. McLaughlin, Dawes & Abbotts, attorneys).
Mr. William J. Brennan, III argued the cause for respondents (Mr. Arthur J. Sills, Attorney General, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Petitioners instituted this declaratory judgment proceeding under R.R. 4:88-10 and N.J.S.A. 26:2C-20 seeking judicial review of the validity of chapter X-A of the New Jersey Air Pollution Control Code (Code) promulgated by the State Commissioner of Health (Commissioner) on March 4, 1968 pursuant to the authority conferred on the State Department of Health (Department) by the Legislature under N.J.S.A. 26:2C-8.

I
On August 9, 1967 the Commissioner gave a notice of a public hearing on proposed chapter X of the Code, entitled "Control and Prohibition of Air Pollution From Sulphur Dioxide Caused by the Combustion of Fuel." (Section 3, dealing with coal, later became chapter X-A.) Accompanying the notice was the text of the proposed regulations, together with a foreword, an outline describing the effect of the regulations, an explanation of the basis for their promulgation, a data appendix and a bibliography.
Four days of hearings in the fall of 1967 produced the extensive record now before this court for review. Testimony was received from representatives of citizens interested in clean air, the fuel industry, collateral enterprises and groups likely to be affected by the Code (e.g., railroads, labor, users *108 of fuel such as utility companies), as well as experts in air pollution and fuels generally. Chapter X-A, as promulgated, was substantially as had been proposed in the notice of hearing and dealt with the control and prohibition of air pollution from sulphur dioxide caused by the combustion of coal. Scheduled to become effective May 6, 1968, we stayed enforcement of the chapter pending final determination of the present proceeding.
Petitioners are concerned with bituminous coal, defined in section 1.3 of the regulations as coal "containing 70-85 percent carbon having usually more than seven percent volatile matter." Section 2-2 prohibits the sale or use of bituminous coal after May 6, 1968 containing sulphur in excess of 1% by weight. However, the limitation imposed by that section is subject to exceptions. Thus, section 2.3 (a) makes section 2.2 inapplicable in any case where, by use of an approved stack gas-cleaning process, it is demonstrated to the Department that sulphur dioxide emissions into the atmosphere from any stack or chimney can be controlled to levels that do not exceed at any time 1.5 pounds of sulphur dioxide per 1,000,000 BTU gross heat input. And section 2.3(b) provides that the Department may authorize a less restrictive percentage than 1% of sulphur by weight in the case of specific steam or electric power generating facilities, but in no case more than 1.5%. (The record shows that large consumers of coal for power purposes, such as electric utilities, consume approximately 87% of the bituminous coal used in New Jersey.)
Chapter X-A further provides, under section 2.4, that on and after October 1, 1971 bituminous coal containing sulphur in excess of 0.2% by weight shall not be sold for use or used in New Jersey. Here, again, the Department may authorize a less restrictive standard in the case of specific steam or electric power generating facilities (section 2.5(b)), and where sulphur dioxide emissions are controlled by the cleaning of stack gases to a prescribed minimum (section 2.5(a)).
*109 The Air Pollution Control Act (1954), as amended by L. 1967, c 106, gave the Department broad powers to abate the air pollution menace to public health of which this court took judicial notice in Department of Health v. Owens-Corning Fiberglas Corp., 100 N.J. Super. 366 (1968), affirmed per curiam 53 N.J. 248 (1969). N.J.S.A. 26:2C-8 provides:
"The department shall have power to formulate and promulgate, amend and repeal codes and rules and regulations preventing, controlling and prohibiting air pollution throughout the State or in such territories of the State as shall be affected thereby * * *."
Before any such code, rule or regulation is promulgated, there must be 30 days' notice of a hearing at which opportunity shall be given the public to be heard with respect thereto. The statute further requires that no code, rule or regulation shall become effective until 60 days after adoption.
The testimony given at the 1967 hearings was not produced in adversary fashion. Rather, the sessions were conducted in the same manner as legislative hearings: anyone interested was allowed to make a statement or presentation and speakers were sometimes questioned by the hearer. Citizen groups and legislators commended the Department for its efforts in controlling air pollution. Those opposed to the proposed regulations complained of the severe effect they would have on the state, and, to some extent, the national economy in general, and on their specific enterprises or interests in particular. Various witnesses indicated that there was not presently available any material quantity of bituminous coal which could meet the required sulphur content level in the immediate future. The economic impact of chapter X-A upon railroads, railroad labor, the coal industry and labor in Appalachia, a distressed area, would be immediate and substantial. The cost to the utility fuel companies of conversion, as well as higher fuel costs, would increase the cost of electrical energy to consumers. Some of *110 the witnesses stated that stack gas-cleaning is presently not effective enough to permit combustion of higher sulphur content fuels so as to emit sulphur dioxide into the atmosphere within the prescribed levels established by the proposed regulations. However, they indicated that the technology is improving and that such systems may soon be generally and practically available. Thus, some opposition spokesmen called for a relaxation in the tolerance levels while others wanted an increase in lead time to permit technological development.
In essence, those who sought to justify delay in the implementation of a program specifically designed to protect the public health and welfare did so on economic grounds. In Owens-Corning we said:
"* * * Assuredly, it is not unreasonable for the State, in the interest of the public health and welfare, to seek to control air pollution. Even if this means the shutting down of an operation harmful to health or unreasonably interfering with life or property, the statute must prevail. But no such drastic measure was called for in this case." (100 N.J. Super., at page 394)
The air pollution controls called for by chapter X-A are indeed drastic, but necessary  a fact fully realized by the Department. The information contained in the materials accompanying the notice of public hearing  as well as the testimony and proofs adduced in support of the regulations  fully supports what was said in the foreword:
"While the burning of fuel produces a number of pollutants such as smoke, fly ash, carbon monoxide, aldehydes, etc. the chief villain is considered to be sulfur dioxide. This invisible gas results from the burning of sulfur which is naturally contained in coal and oil.
Ninety percent of all sulfur dioxide in our north metropolitan atmosphere comes from fuel-burning; the other ten percent comes from the chemical processes of industry which are already under regulation by Chapter VIII of the Air Pollution Control Code. Of the ninety percent which is caused by fuel burning about 1/3 results from the generation of electricity by public utilities, 1/3 from industrial heat and power generation, and 1/3 from the heating of homes, stores, and offices.
According to the United States Public Health Service the New Jersey-New York Metropolitan area is considered to have higher levels *111 of sulfur dioxide contamination than any other metropolis in the nation. Our own air testing confirms that the levels are high. This contaminant has been statistically associated with respiratory diseases. It has been argued  not conclusively but very persuasively  that the current levels are harmful to health.
Because human health and perhaps life itself are at stake, we can't wait for a long-term epidemiology to prove irrefutably that such harm is being done. Control should be undertaken now.
Because we do not yet have economical methods of removing sulfur dioxide from the combustion products in the stack, the method of regulation is to limit the amount of sulfur contained in the fuel in the first place.

* * * * * * * *
Two important things can be said about the proposed code Chapter:
1. Compliance with its standards will effectively deal with the problem of sulfur dioxide pollution.
2. Compliance is possible, at a price  a high price. The price includes increased cost of fuel, the expense of equipment conversion, and all the economic dislocations caused by the required changes in fuel use patterns."

II
Petitioners do not challenge the constitutionality of the Air Pollution Control Act (1954), as amended, noting the recent unsuccessful attempt to do so in Owens-Corning where it was argued that the statute unlawfully delegated legislative power to the former Air Pollution Control Commission, whose functions and powers have now been taken over by the Department. They concede that the act represents a proper exercise by the Legislature of the State's police power, designed to serve an essential and vital interest of the New Jersey public. The grounds on which petitioners challenge chapter X-A are, in brief, that (1) its requirements are unreasonable; (2) the regulations are void by reason of the failure of the Department to observe due process of law; (3) their promulgation exceeded the authority delegated to the Department by the Legislature, and (4) the regulations constitute an unreasonable burden upon interstate commerce, in violation of the United States Constitution.
Initially, we observe that chapter X-A, promulgated pursuant to the authority expressly conferred by N.J.S.A. *112 26:2C-8 and which seeks to prevent, control and prohibit air contamination by sulphur dioxide emissions into the atmosphere, is well within the scope of the legislative grant. Department of Health v. Owens-Corning Fiberglas Corp., above; Department of Health v. Roselle, 34 N.J. 331, 347-348 (1961). Quite understandably, petitioners cannot claim that the Air Pollution Control Act (1964), as amended, is constitutionally invalid as an unreasonable response to an evil within the Legislature's power to regulate. As we said in Owens-Corning, "The menace to the public health by air pollution is so much a matter of common experience as properly to be a subject of judicial notice." (100 N.J. Super., at page 381)
The main thrust of petitioners' attack is on the procedure followed in promulgating chapter X-A. In their view, the hearings leading to its adoption should have been conducted in judicial fashion, with examination and cross-examination of witnesses called by either side. The Commissioner should then have made findings of fact so as to permit of an informed judicial review. In short, petitioners would have us review the validity of chapter X-A as we would a judgment or an administrative order under R.R. 4:88-8. Their argument is wide of the mark, for they wholly misconceive the procedure to be followed in promulgating an administrative rule or regulation, legislative in nature, and the proper scope of this court's review thereof under R.R. 4:88-10.
Indeed, we find it difficult to follow petitioners' presentation in light of the concessions made in their brief and at oral argument. They say that "philosophical considerations aside, there can be no doubt that the label to be applied to the action under review here is `quasi-legislative.'" (Petitioners realistically recognized this to be so by bringing their action under R.R. 4:88-10.) They also state that "Though `findings of fact' are not, in terms, required by the enabling act, the task of the court is greatly magnified by their absence." *113 The fact is that well established law compels these concessions.
Specifically, petitioners complain that they were denied due process because the hearing officer limited the presentations of interested parties to statements only and would not permit any dialogue or debate on the merits of the proposed chapter. They cite only one case in support of their position  Application of Plainfield-Union Water Co., 11 N.J. 382 (1953). The court there was concerned with the adjudicatory role of the administrative agency. The matter in issue was one of "judicial inquiry" where the agency was concerned with "the application of the statutory policy and rule of action." The court likened the matter before it to "judicial proceedings." What was said in Plainfield-Union has no application here. No one has ever suggested that the same rules apply to legislative-type hearings. In its rule-making capacity, an administrative agency is nothing more than a minor legislative body considering proposed legislation under a grant of power:
"* * * Administrative rule-making remains in essence, however, the enactment of legislation of general application prospective in nature. The object is not legislation ad hoc or after the fact, but rather the promulgation, through the basic statute and the implementing regulations taken as a unitary whole, of a code governing action and conduct in the particular field of regulation so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance. * * *" Boller Beverages, Inc. v. Davis, 38 N.J. 138, 151-152 (1962).
When an administrative agency acts legislatively, it should conduct its proceedings as does a legislature. The strictures of judicial procedure are wholly unrelated and unadapted to the promulgation of rules and regulations. See generally, Fuchs, "Procedure in Administrative Rule-Making," 52 Harv. L. Rev. 259 (1938); Gellhorn and Byse, Administrative Law, Cases and Comments (4th ed. 1960), p. 725 et seq.
The real question in this case is whether the challenged regulations are reasonably related to the State's *114 power to preserve and protect the health of its citizens. The fact that the regulations find their expression in an administrative code rather than in a legislative enactment is of no consequence. In either case, facts sufficient to justify the regulation must be presumed. The burden is not upon the Commissioner to establish that the requisite facts exist; Rather, the burden is on petitioners to establish that they do not.
Pacific States Box and Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L. Ed 138, 101 A.L.R. 853 (1935), directly supports these views. In that case an Oregon statute empowered the Chief of the Division of Plant Industry, after investigation and public hearing and subject to the approval of the Director of Agriculture, to promulgate "official standards" for containers of horticultural products, "in order to promote, protect, further and develop the horticulture interests" of the state. Pursuant to the legislative power so conferred, and after a public hearing, there was promulgated an order prescribing certain standard containers for raspberries and strawberries  the only type of containers lawful for use in Oregon after June 15, 1933. Plaintiff manufactured a container which did not conform to the regulations. Among other things, it asserted that the expense of installing requisite machinery to manufacture conforming containers made it impracticable for it to do so. Plaintiff claimed  much as petitioners do here with respect to bituminous coal  that the effect of the regulations was such as to exclude its containers from use in Oregon. It characterized the order under attack as arbitrary and as not reasonably necessary for the accomplishment of any legitimate purpose of the state's police power.
The Supreme Court rejected the argument. After holding that the order was not arbitrary or capricious, and that it did not conflict with any standard established by Congress, grant a monopoly to those manufacturing the standard containers or unduly burden interstate commerce, the court said:
*115 "* * * The order here in question deals with a subject clearly within the police power. See Turner v. Maryland, 107 U.S. 38 [2 S.Ct. 44, 27 L.Ed. 370]. When such legislative action `is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary.' Borden's Farm Products Co., Inc. v. Baldwin, 293 U.S. 194, 209 [55 S.Ct. 187, 79 L.Ed. 281] * * *." (at page 185, 56 S.Ct., at page 163)
Accord, United States v. Rock Royal Co-Operative, Inc., 307 U.S. 533, 567-568, 59 S.Ct. 993, 83 L.Ed. 1446 (1939).
In answer to Pacific States' contention that while a legislative enactment might be entitled to the benefit of the presumption that facts existed which supported its constitutionality, a regulation adopted by an administrative body was not, the court said:
"* * * The contention is without support in authority or reason, and rests upon misconception. Every exertion of the police power, either by the legislature or by an administrative body, is an exercise of delegated power. Where it is by a statute, the legislature has acted under power delegated to it through the Constitution. Where the regulation is by an order of the administrative body, that body acts under a delegation from the legislature. The question of law may, of course, always be raised whether the legislature had power to delegate the authority exercised. Compare Panama Refining Co. v. Ryan, 293 U.S. 388 [55 S.Ct. 241, 79 L.Ed. 446] and A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 [55 S.Ct. 837, 79 L.Ed. 1570]. But where the regulation is within the scope of authority legally delegated, the presumption of the existence of facts justifying its specific exercise attaches alike to statutes, to municipal ordinances, and to orders of administrative bodies. Compare Aetna Insurance Co. v. Hyde, 275 U.S. 440, 447 [48 S.Ct. 174, 72 L.Ed. 357]. * * *" (296 U.S., at pages 185-186, 56 S.Ct., at page 163)
Accord, Commonwealth v. Sisson, 189 Mass. 247, 252, 75 N.E. 619, 621, 1 L.R.A., N.S. 752 (Sup. Jud. Ct. 1905).
The court went on to reject the argument, identical to petitioners' here, that the order was void because the administrative *116 agency made no findings of fact. The challenged regulation, it said, was adopted after notice and public hearing, as required by the statute. The statute did not require special findings, "doubtless because the regulation authorized was general legislation, not an administrative order in the nature of a judgment directed against an individual concern." (at page 186, 56 S.Ct., at page 164).
In Jones v. District of Columbia, 116 U.S. App. D.C. 301, 323 F.2d 306 (D.C. Cir. 1963), property owners challenged the constitutionality of the fire provisions of the District of Columbia building code which required the owner of a building over 30' in height to equip it with suitable means of egress, fire extinguishers and such other appliances as the District Commissioner might deem necessary. The regulations were adopted after a public hearing had been held, as required by the enabling statute. As in the present case, the hearing was conducted in a legislative and not judicial manner. Like the present petitioners, plaintiffs in that case claimed that the fire regulations were invalid because the Commissioners had not held an adjudicative hearing and because the hearings as held failed to disclose facts warranting and supporting the regulations as promulgated. After observing that the public hearing was for the purpose of advising the public of the proposed regulations and affording its members an opportunity to show by evidence, or otherwise, that the regulations, or some of them, were not in the public interest, the court said:
"* * * There is no requirement that the facts developed at these quasi-legislative hearings support each and every provision of the regulations which result therefrom.
* * * A legislative hearing relates to `the making of a rule for the future' [citing Holmes, J., in Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)]. As distinguished from a judicial inquiry, it is a non-adversary proceeding which seeks to devise broad policy applicable to the public generally, or a substantial segment thereof, rather than to individual parties. In such hearings, `it is not necessary that the full panoply of judicial procedures be used.' Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960). While fact finding may *117 to some extent be involved in the process, the due process requirements of confrontation and cross-examination, the hallmarks of the judicial inquiry, are not necessarily present. Rather the quasi-legislative inquiry tends to consult broad relevant data available from surveys, studies and published experience, free from the limitations of confrontation and cross-examination. Initially, the quasi-legislative inquiry depends on staff work. As here, the staff report often is presented to the interested public with the invitation to appear at a public hearing to oppose or praise. From a practical standpoint, with respect to some forms of quasi-legislative inquiries, such as one related to the proposed promulgation of a building code, this is the only feasible way to proceed." (at pages 308-309)
The court further held that the constitutionality of the regulations was to be measured by the standard to be applied to a legislative enactment:
"The provisions of the Building Code, like municipal ordinances passed for the protection and the safety of the public, are themselves protected by a strong presumption of constitutionality. They cannot be declared unconstitutional unless their provisions are clearly arbitrary and unreasonable and have no rational relationship to the purpose intended. Cf. 5 McQuillin, Municipal Corporations (3rd Ed.) §§ 19.05-06. Measured by this test, the regulations under attack here are not only constitutional as promulgated, but also as applied." (at page 310)
The procedure followed in the public hearings held under Department auspices here has long been recognized by our cases, which hold that the elements attendant upon judicial proceedings, including findings of fact based upon the record, is entirely inappropriate to administrative proceedings of a legislative nature. See, for example, State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 523 (E. & A. 1935); In re Port Murray Dairy Co., 6 N.J. Super. 285, 293-294 (App. Div. 1950); Welsh Farms, Inc. v. Bergsma, 16 N.J. Super. 295, 301 (App. Div. 1951); Garden State Farms v. Armstrong, 31 N.J. Super. 61, 77-78 (App. Div. 1954); Bayonne v. Division of Tax Appeals, 49 N.J. Super. 230, 240 (App. Div. 1958); Schinck v. Board of Education, etc., 60 N.J. Super. 448, 468-469 *118 (App. Div. 1960); Wilson v. Long Branch, 27 N.J. 360, 389 (1958).
Findings of fact, with the necessary due process elements of examination and cross-examination, are required only when the administrative process is adjudicatory in nature or when the Legislature requires that such findings be made before the agency can act. Cf. In re Plainfield-Union Water Co., above, 11 N.J. 382, 392, 395 (1953); Abbotts Dairies v. Armstrong, 14 N.J. 319, 331-334 (1954). N.J.S.A. 26:2C-8 does not require the making of findings of fact in support of any code, rule or regulation promulgated under the authority therein delegated. The public has a right to be heard, but the statute does not grant those who may be affected by the administrative action the right to argue or cross-examine.
The Legislature contemplated the very procedure followed. The Commissioner's promulgation of chapter X-A was within the authority delegated by the Legislature; it was entirely correct to conduct a legislative-type hearing, and due process was not denied petitioners.
We turn to the question of whether there was a rational basis for the action taken. Were the regulations reasonably related to the State's power to preserve and protect the health of its citizens? Petitioners contend there is no realistic standard for the minimum sulphur content in bituminous coal fixed by chapter X-A. Additionally they claim, as hereinbefore noted, that there is not presently available any material quantity of bituminous coal such as would meet the 1% and 0.2% requirements. Further, they emphasize the severe impact that chapter X-A would have upon the railroad and coal industries and upon labor. They also insist that the May 6, 1968 and October 1, 1971 dates fixed by the chapter are not prudent.
Petitioners concede, as they must, that the administrative action taken must be accorded a presumption of reasonableness and that they have the burden of satisfying the court that the regulations are unreasonable. As was *119 said in Pacific States, above, quoting from Borden's Farm Products Co., Inc. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281 (1934), when legislative action taken by an administrative agency is called into question, "if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts * * *." Those who oppose it "must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary."
It may be assumed  in fact, the Department's own research and available authoritative studies show  that the Department had knowledge of information in the public domain. (The material attached to the proposed text of the regulations, to which the notice of public hearing called attention, makes this manifest.) The combustion of bituminous coal admittedly results in the emission of sulphur dioxide into the ambient air. The Department was aware of New Jersey's great population density, particularly in the northern, central and southwestern parts of the State, and the high concentration of industry, especially in the northern area. It was also aware of the fact that air pollution had reached dangerously high levels on several recent occasions in this State and its immediate neighboring areas to the north and west, and that in some instances people had succumbed, probably as a result of such conditions. Considering all this, there was justification for the Department taking prompt and drastic steps to reduce air pollution and in directing any action it took toward those elements  here, fuel oil and coal  whose combustion is a major source of such pollution. In Owens-Corning, above, we took judicial notice of the menace to the public health of air pollution. Public health is more than ever a paramount concern of government. Abelson's, Inc. v. N.J. State Board of Optometrists, 5 N.J. 412, 420 (1950).
Applying the test set out in the Pacific States case as to whether there exists a state of facts sufficient to justify the *120 exercise of the State's police power, we are entirely satisfied from the record that sulphur dioxide emissions into the atmosphere are, or tend to be, in the words of N.J.S.A. 26:2C-2, "injurious to human health or welfare, animal or plant life or property, or would unreasonably interfere with the enjoyment of life or property throughout the State and in such territories of the State as shall be affected thereby * * *."
What our Supreme Court said in Abelson's regarding the statute there under attack, is applicable to the air pollution regulations challenged here:
"* * * If the measures invoked tend to serve a legitimate interest of society, the wisdom of the course taken is not ordinarily a justiciable question. When the subject lies within the police power of the State, `debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment.' * * * The range of the State's discretion in promoting the security and well being of the public `accords with the subject of its exercise.' * * * Where the end is one to which legislative power may properly be directed, it is enough `if it can be seen that in any degree, or under any reasonably conceivable circumstances, there is an actual relation between the means and the end. * * *." (5 N.J., at page 420; citations omitted)
The presumption of the existence of facts sufficient to sustain the departmental action here taken stands until rebutted. We are satisfied from a careful reading of the entire record that petitioners have failed to rebut the presumption of validity which attends chapter X-A.

IV
Although what we have said disposes of the question of whether chapter X-A represents a proper exercise of the State's police power, some brief reference to the evidence adduced is not inappropriate. In March 1967 the Public Health Service of the U.S. Department of Health, Education and Welfare issued its "Air Quality Criteria for Sulphur Dioxide." This document was frequently referred to *121 at the departmental hearings. It is listed in the bibliography accompanying the notice of public hearing, and was inserted in the record by the hearer. The Public Health Service found that the use of sulphur-containing fossil fuels, such as coal and oil, for power and heat, results in sulphur oxides, their acids and acid salts, being among the most commonly occurring of the atmospheric pollutants in this country. Above certain levels, such pollution unquestionably has adverse effects on the respiratory system and general health, reduces visual range, prolongs fogs, damages materials and injures vegetation.
The chairman of the Special Committee of Air Pollution Control of the New Jersey Medical Society, Dr. Roslyn Barbash, supported the Department's proposals for limiting sulphur dioxide caused by the combustion of fuel and strongly urged the adoption of the time schedules contained in the regulations. Her testimony is especially significant from a medical point of view:
"Sulfur oxides are irritants to the tender membranes of the eyes, nasal passages, sinuses, trachea, bronchial tree and air sacs of the lungs. In addition to the direct irritating effect of sulfur dioxide, its conversion to sulfur trioxide and sulfuric acid mist puts it into an aerosol form which permits deep penetration into the lung and absorption into the blood stream. Any person can see the corrosive effects of the sulfur oxides by examining our outdoor sculptures, stone facing of buildings, the famous obelisk in Central Park, When you see the dissolution of the stone carvings you get some idea of what goes on within the delicate structures of the body. Confronted with the forced exposure to the noxious sulphur oxides, man fights back physiologically. His eyes tear in an attempt to wash away this foreign element, the hairlike sweepers in his bronchial apparatus (the cilia) wave valiantly in an effort to sweep out the intruding gas, his glands pour forth mucus to protect his tissues, he coughs to rid himself of the intruder. The irritations of this defensive battle cause swelling of the lining of the bronchial tree, spasm of the irritated bronchial muscles, and with frequent repetition of such onslaughts, permanent scarring of his lungs. He must work harder for his birthright  the right to breathe freely. As he presses harder to get air in and out of his lungs, his poor heart must labor and strain to provide additional blood for this extra work load. Such tissue changes make man more vulnerable and susceptible to infection and to tumor formation.
*122 I pass over the other effects: assailment of senses of smell, visual acuity, blurred by the irritations and tearing, the aesthetic depression from the many phases of land and commodity deterioration from pollution. All such depressing factors have a detrimental action on mental well-being and consequently on the physical state. * * *"
Susceptibility to the adverse effects of sulphur oxides, she said, is not limited to sick people only. She went on to describe important segments of the population who are neither old nor sick, but are sickened by air pollution. Dr. Barbash's only criticism of the regulations was that "if anything, they are too liberal."
Immediate action to regulate pollution from sulphur dioxide emissions was urged by legislators, representatives of citizens groups, and individual citizens who spoke at the hearings. Additionally, a letter from S. Smith Griswold, Associate Director for Abatement and Control Programs, National Center for Air Pollution Control, U.S. Public Health Service, was read into the record. He commended the proposed regulations as an effective response to air pollution from sulphur dioxide, but was of the opinion that they were not sufficiently restrictive and proposed tighter regulation.
As to the reasonableness of the regulatory scheme, it should be pointed out that, contrary to the impression one may get from some of those who opposed the regulations, chapter X-A does not entirely forbid the use of bituminous coal in New Jersey. The electric utilities, which burn 87% of such coal used in this State, are granted an exception. As mentioned above, they may burn bituminous coal with a sulphur content of 1.5% by weight if they can establish to the satisfaction of the Department that a lower sulphur content coal is unsuitable for their boilers. In this connection, it is appropriate to note that, in contrast to statements made at the hearings, there is presently available substantial quantities of bituminous coal which would meet the 1% requirement of chapter X-A. In their report on "Coal Resources of West Virginia and Their Importance to Our *123 State's Economy," presented before the West Virginia Coal Mining Institute on April 27, 1967, Paul H. Price, Director and State Geologist of West Virginia, and Ira S. Latimer, Jr., Geologist and head of the Geologic and Data Section, stated that West Virginia alone has 47 billion tons of coal having a sulphur content of 1% by weight or less. In addition, there are 35 billion tons with a sulphur content of 1.1-2.0%.
Discussing methods useable in the control of sulphur oxides emitted by electric power generating stations, James R. Garvey, president and research director of Bituminous Coal Research, Inc., testified at the October 6, 1967 hearing that a process permitting of high sulphur coal being burned without giving off any appreciable amounts of sulphur dioxide would be developed and in use within three or four years  that is, by October 1, 1971, the date when the 0.2% restrictive regulation would go into effect. It follows from this expert opinion that utilities able to show the Department that they could not meet the 1% limit could, before that date, burn 1.5% by weight sulphur coal, and smaller units would burn 1%. With sufficient resources of low sulphur coal apparently available until October 1, 1971, chapter X-A would serve as a spur to the industry to develop the process of which Garvey spoke. Such was the testimony of C. Howard Hardesty, executive vice-president of the Consolidation Coal Company. Although he considered the proposed regulations unrealistic, he said, "I would be less than honest if I didn't admit [that] industry, from time to time, needs a whip on its back. Industry will meet the demands of society if you have a target to shoot for."
Chapter X-A is, of course, only part of the Department's integrated plan to abate all sources of air pollution. The full scope of that plan is revealed by an examination of the New Jersey Air Pollution Control Code, whose substantive provisions regulate open burning (chapter II), black smoke (chapter IV), fly ash (chapter V), air pollution as statutorily defined in N.J.S.A. 26:2C-2 (chapter VI, and see *124 Department of Health v. Owens-Corning Fiberglas Corp., above), particulate matter (chapter VII), sulphur oxides from industrial processes (chapter VIII) and incinerator operation (chapter IX). The Department is presently moving to control automobile exhaust emissions.

V
Petitioners argue that the adoption of chapter X-A exceeded statutory authority. They readily admit that N.J.S.A. 26:2C-8 evidences a broad and pervasive grant of power to the Department with respect to promulgating codes, rules and regulations preventing, controlling and prohibiting air pollution throughout the State. However, they claim that N.J.S.A. 26:2C-8 must be read with N.J.S.A. 26:2C-3.2, establishing a Clean Air Council in the State Department of Health, and N.J.S.A. 26:2C-3.3, setting out the Council's powers and duties. The legislative scheme, they say, is that the Department and the Council act coordinately in dealing with the problems of air pollution control. Petitioner would have us hold that the Council is intended to act as a limiting force upon the Department's power to promulgate rules and regulations dealing with air pollution.
N.J.S.A. 26:2C-3.2 calls for a clean Air Council consisting of 17 members: three from the State Government  the Commissioner of Labor and Industry, the Commissioner of Community Affairs and the Secretary of Agriculture, or their respective designees  to serve ex officio; six citizens of New Jersey representing the general public, at least one of whom shall be a medical doctor licensed to practice in this State, and eight members to be named by the Governor from organizations specifically listed in the act. The appointments so called for had not been made at the time chapter X-A was promulgated. Petitioners therefore contend that the Department, in adopting chapter X-A, proceeded without the benefit of the knowledge and understanding of the Council members, and its action is therefore invalid.
*125 The argument is specious. Petitioners concede that the statute does not condition the authority of the Department to adopt rules and regulations upon the formation, advice and action of the Clean Air Council. Nothing in N.J.S.A. 26:2C-3.3, dealing with the powers of the Clean Air Council, expressly or as much as impliedly gives it the right to limit departmental action. Thus, even had the Council been in existence at the time of the hearings on and the adoption of chapter X-A, the Department would have been under no obligation to consult and advise with it. Although N.J.S.A. 26:2C-3.3 (c) permits the Council  were there one  to submit to the Commissioner of Health recommendations it deemed necessary for the proper conduct and improvement of the air pollution control program, such recommendations would in no way have been binding upon him.
In this connection, we note that L. 1967, c. 106, amending the Air Pollution Control Act (1954), abolished the Air Pollution Control Commission which had been created under the 1954 act (N.J.S.A. 26:2C-3 to 8) and which had the power to promulgate rules and regulations. It provided for a Clean Air Council in place of the Commission, but the latter's rule-making power was transferred to the Department of Health itself under N.J.S.A. 26:2C-8. One must draw the conclusion that the Legislature, faced by the increasingly serious and indeed emergent problem of air pollution, was not satisfied with the progress made by the former Commission.
Moreover, the various points of view that might have been reflected in the Clean Air Council, had it been set up, were more than adequately represented by those who spoke at the 1967 hearings as representatives of government, industry and the citizenry of this State.

VI
Finally, petitioners contend that chapter X-A constitutes an unreasonable burden upon interstate commerce, *126 and thus violates the Commerce Clause of the United States Constitution, Art. I, Sec. 8, clause 3.
Not all state regulations affecting commerce are invalid. The cases which petitioners cite in support of their argument all illustrate direct regulation of commerce itself, or the instruments thereof  e.g., Bibb v. Navajo Freight Lines, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1957); Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1944). None is concerned with incidental effects upon commerce which are permissible, as in Head v. New Mexico Board of Examiners in Optometry, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963), or Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).
In Huron the City of Detroit had passed a smoke abatement code that included criminal sanctions. The code applied to ships operating in interstate commerce but docked in the Port of Detroit. The court held that in matters of air pollution the states may in many areas of commerce act concurrently with the Federal Government. The touchstone is whether the state or local regulation is even-handed; if so, and if it serves a legitimate local public interest and has not been preempted by Congress, it has to be left standing unless some undue burden on commerce can be shown.
"In determining whether the state has imposed an undue burden on interstate commerce, it must be borne in mind that the Constitution when `conferring upon Congress the regulation of commerce, * * * never intended to cut the States off from legislating on all subjects relating to health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.' Sherlock v. Alling, 93 U.S. 99, 103 [23 L.Ed. 819] [1876] * * *." (at pages 443-444, 80 S.Ct., at page 816)
The court went on to hold that the local interest in the abatement of air pollution and its attendant dangers to public health and welfare preponderate over the interest *127 arising under the Commerce Clause, and that federal ship inspection provisions did not preempt the field.
Congress recognized as long ago as 1955 that air pollution is a matter for state regulation. The Senate Committee considering the matter reported that
"The committee recognizes that it is the primary responsibility of State and local governments to prevent air pollution. The bill does not propose any exercise of police power by the Federal Government and no provision in it invades the sovereignty of States, counties or cities." (Sen. Rep. No. 389, 84th Cong., 1st Sess.)
This view was reaffirmed by the Air Pollution Control Law, 42 U.S.C., § 1857 et seq., as amended by the Air Quality Act of 1967, P.L. 90-148. Section 101(a)(3) states that "the prevention and control of air pollution at its source is the primary responsibility of states and local government * * *." Federal action to abate air pollution will be taken only when states have failed to act:
"Consistent with the policy declaration of this title, municipal, State, and interstate action to abate air pollution shall be encouraged and shall not be displaced by Federal enforcement action except as otherwise provided by or pursuant to a court order under subsection (c), (h) or (k)." (Section 108(b))
This act, which has been ignored or overlooked by petitioners, makes it clear that the states have full responsibility for air pollution abatement. Of necessity, regulation of the kind here involved is impossible without having some indirect effect on interstate commerce, as in Huron. (We note, incidentally, that chapter X-A affects only the sale or use of bituminous coal within the borders of New Jersey and carefully avoids dealing with such sale or use beyond our borders.) The Commissioner, in promulgating the chapter, acted strictly within the letter and spirit of the federal legislation, so that the validity of chapter X-A under the Commerce Clause is unassailable. Panhandle Eastern Pipe Line Co. v. Public Service Comm'n of Indiana, 332 U.S. 507, 520-521, 68 S.Ct. 190, 92 L.Ed. 128 (1947).
*128 Accordingly, we sustain the validity of chapter X-A of the New Jersey Air Pollution Control Code. The stay heretofore granted is dissolved. No costs.