COMMONWEALTH EDISON COMPANY, Petitioner, *v.* THE POLLUTION CONTROL BOARD *et al.*, Respondents.

(No. 57487;

First District (3rd Division)—December 19, 1974.

*Rehearing denied January 23, 1975.*

272

Isham, Lincoln & Beale, of Chicago (Richard E. Powell, Charles E. Whalen, and Gerald D. Mindell, of counsel), for petitioner.

William J. Scott, Attorney General, of Springfield (James I. Rubin, Richard W. Cosby, and Thomas J. Immel, Assistant Attorneys General, and Merideth Wright, Senior Law Student, of counsel), for respondents.

Mr. PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

In 1971, the Federal Environmental Protection Agency, acting under the Clean Air Act amendments of 1970 (42 U.S.C. § 1857 *et seq.* (1970), amending 81 Stat. 485 (1967)), adopted new primary and secondary ambient-air-quality standards. (42 C.F.R. § 410.1 *et seq.* (1971).) By its terms the States were required to devise their own implementation plans to achieve compliance with Federal standards. Accordingly, the Illinois Environmental Protection Agency (hereinafter the Agency), acting pursuant to section 4(j) of the Environmental Protection Act (hereinafter the Act) (Ill. Rev. Stat. 1971, ch. 111½, par. 1004(j)), submitted proposals to the Illinois Pollution Control Board (hereinafter the Board) governing the emission rates of various pollutants into the air which it deemed necessary to achieve compliance with those Federal standards. Included in the plan were substantive rules limiting the emission rates from stationary sources for particulates and sulfur. In a consolidated proceeding, the Board held public hearings in relation to the proposed plan. Petitioner, Commonwealth Edison Company (hereinafter Commonwealth), appeared and produced testimony critical of the plan. On April 13, 1972, the Board adopted a final set of rules and regulations, and accompanied their issuance with an explanatory opinion entitled "In the Matter of Emission Standards." (# R. 71-23.) Pursuant to section 29 of the Act, Commonwealth has filed directly in this court a petition seeking review of the rules pertaining to the particulates and sulfur dioxide emission limitations. Commonwealth also challenges the validity of three other rules promulgated by the Board relating to certain procedures involving the Agency.

Commonwealth contends that Board Rules 203(g)(1) and 204(a)(1) and (c)(1)(A), relating to the limitation of the above-mentioned pollutants, are arbitrary and unreasonable as applied to it or, alternatively, were not enacted in accordance with the statutory command; that Board Rule 103(*l*), which empowers the Agency to require the posting of bond as a condition to the issuance of a permit under Title X of the Act, constitutes an unauthorized legislative penalty, unlawful delegation of legislative authority, and illegal usurpation of judicial powers; that Board

Rule 103(e)(1), which states that the Agency has the power to conduct a hearing pursuant to a permit request, is void as an unlawful delegation of legislative authority; and that Board Rule 303, which authorizes the Agency to vary ambient-air-quality standards in particular instances, is invalid as an unauthorized redelegation of legislative authority. Before reviewing Rules 203 and 204, we elect to consider these latter three contentions.

Since the filing of briefs in this cause, section 39 of the Act has been amended to provide that a bond or other security shall not be required of the applicant by the Agency as a condition for the issuance of a permit. (Ill. Rev. Stat. 1973, ch. 111½, par. 1039(a).) The enactment serves to moot Commonwealth's challenge to Board Rule 103(*l*).

Commonwealth next challenges the validity of Board Rule 103(e)(1). The rule is as follows:

> "The Agency may conduct hearings, prior to issuing a Permit pursuant to this Chapter, to determine whether an applicant has submitted proof that the emission source or air pollution control equipment is or will be in compliance with every Rule of this Chapter."

Commonwealth argues that the rule constitutes an unlawful delegation of authority by the Board of the Agency. Commonwealth points out that the statute does not expressly authorize the Agency to conduct such a hearing, in contradistinction to section 5(d) of the Act, which expressly recites that the Board has the authority to hold a hearing in review of the Agency's denial of a permit application. Commonwealth thus maintains that the legislative intent must have been to deny the Agency the right to hold a hearing pursuant to its consideration of a permit application. The Board responds that the statute gives the Agency the implied power to hold such a hearing and presents the alternative argument that the rule is a proper and valid delegation of power.

■■■ In determining an administrative agency's jurisdiction, the focus is on the agency's creator. (See *Pinkerton's Nat. D. Agency v. Fidelity & Deposit Co.* (7th Cir. 1943), 138 F.2d 469, *cert. denied* (1944), 321 U.S. 766.) An express grant of authority to the agency carries with it the clear and express grant of power to do all that is reasonably necessary to execute the power or perform the duty specifically conferred. *A. F. Staley Manufacturing Co. v. Environmental Protection Agency* (1972), 8 Ill.App.3d 1018, 290 N.E.2d 892.

The principal provision relating to the permit procedure is section 39(a). It states in pertinent part as follows:

> "When the Board has by regulation required a permit for the construction, installation, or operation of any type of facility,

equipment * * *, the applicant shall apply to the Agency for such permit and it shall be the duty of the Agency to issue such a permit upon proof by the applicant that the facility, equipment, * * * will not cause a violation of this Act or of regulations hereunder. The Agency shall adopt such procedures as are necessary to carry out its duties under this Section."

In addition section 4(g) imposes upon the Agency the duty to administer the permit system. According to section 40, an applicant denied a permit may petition the Board for a hearing. Affirmance by the Board will enable the applicant to petition for review directly to this court.

An examination of the Act reveals the depth of the legislature's concern to purify the environment and to take care that new facilities and equipment will not be constructed which might hinder this task. Having found that "environmental damage seriously endangers the public health and welfare" (Ill. Rev. Stat. 1971, ch. 111½, par. 1002(a)(i)), and having specified its purpose to be the creation of "a unified, state-wide program * * * to restore, protect and enhance the quality of the environment" (Ill. Rev. Stat. 1971, ch. 111½, par. 1002(b)), the legislature has prescribed that, when decreed by the Board, a project to be constructed which might violate the applicable statutory provisions or regulations must secure a permit from the Agency. Rather than setting forth detailed procedures which the Agency must follow in administering the permit system, the General Assembly saw fit to adopt broad language empowering the Agency to utilize "such procedures as are necessary" to carry out its statutory mandate.

The power of the Agency is an important one. In our view section 39(a) provides ample power to enable the Agency to conduct a hearing relating to a permit application when it deems it necessary to pass on the application. The Agency may determine that it would be beneficial to hear and question experts to predict the probable impact on the environment that a permit issuance would cause. It may wish to question members of the same or similar industry to accumulate specific information omitted from the application. The Agency may need a clarification or amplification of complicated facts or positions set forth by the applicant. Moreover, as mandated by section 39, subsections (a)(i) through (a)(iv) require a detailed explanation by the Agency to accompany the denial of a permit request which may necessitate the gathering of information not furnished in the application.

We recognize that the legislature saw fit to make an express grant of power to the Board to conduct a hearing upon review of the Agency's denial of a permit application. It can be inferred that the legislature wished to guarantee at least one full hearing in the permit structure and

placed such a hearing at the review stage. At the same time, it can be seen that the legislature determined that the Agency should be free to adopt flexible procedures in gathering evidence and seeking advice, and thus granted that body the power found in section 39(a). While we appreciate the fact that an applicant may be forced to bear the expense of two hearings in its attempt to secure a permit, that will be the price it will have to pay for its decision to construct facilities which the expert agencies have decided possess possible adverse environmental implications.

■■■ We hold that the Agency has the implied power by statute to conduct a hearing pursuant to an application for a permit. Thus, we need not consider Commonwealth's claim that Rule 103(e)(1) constitutes an unlawful delegation of authority by the Board to the Agency.

Commonwealth next challenges the validity of Board Rule 303. It contends that the rule is an unlawful delegation from the Board to the Agency of responsibilities imposed by statute directly on the Board. Commonwealth further argues that if the delegation is not per se unlawful, the failure by the Board to set forth ascertainable standards renders it invalid.

Rule 303 is as follows:

### "Nondegradation

Existing ambient air quality which is better than the established ambient air quality standards at the date of their adoption will be maintained in its present high quality. Such ambient air quality shall not be lowered unless and until it is proved to the Agency that such change is justifiable as a result of necessary economic and social development and will not interfere with or become injurious to human health or welfare."

■■■ The Board is empowered to adopt regulations to promote the control of air pollution (Ill. Rev. Stat. 1971, ch. 111½, par. 1010(b)) and to prescribe standards for the issuance of permits by the Agency (Ill. Rev. Stat. 1971, ch. 111½, par. 1010(c)). While a regulation, like a statute, enjoys the presumption of validity (*Armstrong Chemcon, Inc. v. Pollution Control Board* (1974), 18 Ill.App.3d 753, 310 N.E.2d 648), an administrative agency cannot extend the operation of a statute through its own rulemaking. (*Mallen Co. v. Department of Finance* (1939), 372 Ill. 598, 25 N.E.2d 43.) The key question in determining the validity of a rule or regulation is whether the rule or regulation was made in furtherance of the intentions of the legislature as set forth in the statute. *People ex rel. Illinois Highway Transportation Co. v. Biggs* (1949), 402 Ill. 401 84 N.E.2d 372.

The Board's first answer to Commonwealth's challenge is that the rule

cannot be considered a delegation of authority. Rather the rule must be viewed as merely a statement of "principle" expressing a "policy" to be followed by the Agency in the latter's administration of the permit system. The Board notes page 45 of its opinion accompanying the enactment of the rules, which allegedly supports the Board's underlying position in this regard:

> "Rule 303: *Nondegradation,* embodies the principle, already found in Illinois air quality standards (APCB Rules and Regs. Ch. 5) and in water pollution regulations (SWB-7 through SWB-15; PCB Regs. Ch. 3 Rule 208), that parts of the state now clean shall not be unnecessarily degraded. This does not forbid all new facilities, as some seem to have thought. It requires Agency consideration, in advance of issuing a construction permit, to assure that degradation not justified by need will not occur and that new facilities are not put in the wrong place."

We believe the Board's position to be without merit. The rule cannot be considered a mere expression of policy to guide the Agency's deliberations over a permit request. Section 39 clearly states that if the proof presented to the Agency pursuant to a permit application shows that the proposed construction facility will not cause a violation of the Act or the regulations made thereunder, the permit shall be issued by the Agency. To imply that the Agency shall have the discretion to deny the application where the proposed facility would meet the requirements of the Act or regulations although lower the ambient-air quality essentially authorizes the Agency to create a new ambient-air-quality standard. Since it cannot be disputed that section 5(b) clearly authorizes the Board to create such standards, the rule must be viewed as an attempt by the Board to delegate that duty to the Agency.

■■ Consequently, we must consider the question of whether an administrative agency can validly redelegate authority imposed upon it by statute to another administrative agency through administrative rulemaking in the absence of legislative approval. It must be observed that redelegation, a transmission of authority along horizontal lines, is unrelated and possesses far greater implications than subdelegation, a vertical transmission of power with ultimate authority usually reserved in the transmitter. See 1 Davis, ADMINISTRATIVE LAW TREATISE (1958), § 9.07, at 639.

■■ Courts in this State have consistently held that a legislature's delegation of discretionary power to a municipal corporation will not permit a redelegation by that body in the absence of a clear express or implied authorization in the statute. (*People ex rel. Healy v. Clean Street Co.* (1907), 225 Ill. 470, 80 N.E. 298; *Elder v. Board of Education* (1965), 60

Ill.App.2d 56, 208 N.E.2d 423.) The roots of such a doctrine are found in 2 Am. Jur. 2d *Administrative Law* (1962), § 222, at 52:

"It is a general principle of law, expressed in the maxim "delegatus non potest delegare," that a delegated power may not be further delegated by the person to whom such power is delegated, and that in all cases of delegated authority, where personal trust or confidence is reposed in the agent and especially where the exercise and application of the power is made subject to his judgment or discretion, the authority is purely personal and cannot be delegated to another unless there is a special power of substitution either express or necessarily implied."

Other jurisdictions have also held that a redelegation of a discretionary power by an administrative agency to another agency by its rulemaking power is void. (See *Mercer Council # 4, N.J. Civil Service Association, Inc. v. Alloway* (1972), 119 N.J. Super. 94, 290 A.2d 300; *Bunger v. Iowa High School Athletic Association* (Iowa 1972), 197 N.W.2d 555; *Anderson v. Grand River Dam Authority* (Okla. 1968), 446 P.2d 814; *Voth v. Fisher* (1965), 241 Ore. 590, 407 P.2d 848; *Hillman v. Northern Wasco County PUD* (1958), 213 Ore. 264, 323 P.2d 664; *Hutchins v. Mayo* (1940), 143 Fla. 707, 197 So. 495.) We believe that application of the above-stated redelegation doctrine is appropriate in the present case.

■■■ A thorough scrutiny of the Act conclusively establishes that the legislature intended that the Board alone should possess the power to promulgate air-quality standards. Section 5(b) provides that the *Board* "shall determine, define and implement the environmental control standards" in this State. Section 5(a) recites that the *Board* shall consist of "5 technically qualified members." In the absence of any evidence to the contrary, we believe that the legislature intended that the Board exercise its discretion and apply its expertise in evaluating and promulgating the proper standards governing air quality. It was up to the legislature to vest by appropriate language express or implied authority in the Board to redelegate its duty. The legislature did not do so, and accordingly the Board's attempt to redelegate its duty on its own in the form of Rule 303(e) was futile. Rule 303(e) has no validity.

The primary thrust of Commonwealth's final contention is that Board Rules 203(g)(1) and 204(a)(1) and (c)(1)(A), which limit emissions of particulates and sulfur dioxide from new and existing fuel-combustion stationary sources, are arbitrary and unreasonable as applied to it. The argument is based upon the number of generating units and the nature of operations maintained by Commonwealth.

We will not set forth the operations pertaining to Commonwealth described in the voluminous record before us for the reason that we do not believe an "as applied" argument can be successfully urged in a proceeding such as this.

■■ Substantive rules of this nature are promulgated for general, not special, application. Consequently, investigators for the Board gather facts and solicit expert advice in regard to pollution problems affecting all types of companies in a particular trade. In a case like the present one, the Board would have been charged with investigating facts and operations of all types of generating units—single- and multi-unit, commercial, industrial, and public utility— and from these surveys extrapolate the appropriate principles and propose the necessary regulations. The Board cannot be expected to research, evaluate, and make allowance for every special, unusual, or unique problem involving every producer of electrical energy. Where one fails to challenge the rules generally and instead seeks to relax their enforcement against him exclusively due to arbitrary and unreasonable hardship, the legislature has determined that the appropriate remedy is for the aggrieved party to seek a variance in accordance with Title IX of the Act. If that is denied, the aggrieved can petition to this court for review based on the record at that proceeding. We hold, therefore, that Commonwealth's "as applied" argument cannot be raised at this stage of review.

We next consider Commonwealth's challenge to the general validity of the rules in question. The statute sets out the appropriate standard governing the proper promulgation of substantive rules by the Board. Section 27 states in pertinent part that "the Board shall take into account the existing physical conditions, the character of the area involved, * * * the nature of the existing air quality, * * * and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution." The Board maintains that upon a showing in the record that a single individual emission source can conform technically and economically to the rules, Commonwealth's contention that the rules do not evidence the Board's compliance with the requirement that they evidence technical feasibility and economic reasonableness must fall.

■■ Predicating the validity of these rules upon such a lowest-common-denominator standard cannot be rationalized. Such a proposition fails to take into account any specific reason why the one unit was able to comply. The rules cannot be upheld in such a vacuum. We believe that the rules in question should be found valid when one can reasonably infer from the evidence in the record that the Board con-

cluded in promulgating the rules that it was technically feasible and economically reasonable for a substantial number of the individual emission sources in this State to comply by the specified deadline.

■■■■ We must also determine what the appropriate scope of our review should be. An administrative agency's exercise of its rulemaking powers is legislative in appearance and function. In promulgating rules prospective in application, it acts as "a minor legislative body considering proposed legislation under a grant of power." (*Consolidation Coal Co. v. Kandle* (1969), 105 N.J. Super. 104, 113, 251 A.2d 295, 300.) Thus, we hold that a regulation need not be supported by substantial evidence; rather it will be deemed valid unless shown to be arbitrary, capricious, unreasonable, or otherwise not in accordance with the law. See *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill.2d 305.

The rules in question read as follows:
"Rule 203—*Particulate Emission Standards and Limitations*

   ❋  ❋  ❋

 (g) *Particulate Emission Standards and Limitations for Fuel Combustion Emission Sources.*

  (1) *Fuel Combustion Emission Sources Using Solid Fuel Exclusively.*

   (A) *Existing Fuel Combustion Emission Sources Using Solid Fuel Exclusively Located in the Chicago Major Metropolitan Area.* No person shall cause or allow the emission of particulate matter into the atmosphere from any existing fuel combustion source using solid fuel exclusively, located in the Chicago major metropolitan area, to exceed 0.1 pounds of particulate matter per million btu of actual heat input in any one hour period except as provided in sub-paragraph (C) of this Rule 203(g)(1).

   (B) *Existing Fuel Combustion Emission Sources Using Solid Fuel Exclusively Located Outside the Chicago Major Metropolitan Area.* No person shall cause or allow the emission of particulate matter into the atmosphere from any existing fuel combustion source using solid fuel exclusively, located outside the Chicago major metropolitan area, to exceed the limitations specified in Table 2.4 and Figure 2.3 in any one hour period except as provided in sub-paragraph (C) of this Rule 203(g)(1):

Table 2.4

| Fuel Combustion Emission Source Actual Heat Input million btu per hour | $S_s$ Allowable Emission Standard pounds per million btu |
|---|---|
| less than or equal to 10 | 1.0 |
| greater than 10 but smaller than 250 | $\dfrac{5.18}{\left(\dfrac{H_s}{0.1}\right)^{0.715}}$ |
| greater than or equal to 250 | |

$S_s$ = allowable emission standard in pounds per million btu of actual heat input

$H_s$ = actual heat input, million btu per hour

(C) *Existing Controlled Fuel Combustion Emission Sources Using Solid Fuel Exclusively.*
Notwithstanding sub-paragraphs (A) and (B) of this Rule 203(g)(1), any existing fuel combustion source using solid fuel exclusively may emit up to, but not exceed, 0.2 pounds per million btu, if, as of the effective date of Part 2 of this Chapter, either of the following conditions is met:

(i) The emission source has an emission rate based on original design or equipment performance test conditions, whichever is stricter, which is less than 0.2 pounds per million btu of actual heat input, and the emission control of such source is not allowed to degrade more than 0.05 pounds per million btu from such original design or acceptance performance test conditions; or,

(ii) The source is in full compliance with the terms and conditions of a variance granted by the Pollution Control Board sufficient to achieve an emission rate less than 0.2 pounds per million btu, and construction has commenced on equipment or modifications prescribed under that program; and emission control of such source is not allowed to degrade more than 0.05 pounds per million btu from original design or equipment performance test conditions, whichever is stricter.

(D) *New Fuel Combustion Emission Sources Using*

*Solid Fuel Exclusively.*

No person shall cause or allow the emission of particulate matter into the atmosphere in any one hour period from any new fuel combustion emission source using solid fuel exclusively, to exceed 0.1 pounds of particulate matter per million btu of actual heat input.

PROVISO: Nothing in this rule 203(g)(1) shall be construed to apply in any manner inconsistent with the following paragraph 8 (B) of an order of the Circuit Court of Cook County dated April 13, 1972 in case no. 72 CH 1484:

The defendants, and each of them, their agents, employees, and attorneys, are hereby restrained for a period of ten days from the date hereof from (1) adopting or from (2) holding or conducting, scheduling or rescheduling public hearings pertaining to the adoption of proposed Rule 203(g)(1)(A) of the Illinois Pollution Control Board and so much of proposed Rule 203(g)(1)(C) of the Illinois Pollution Control Board as pertains to proposed Rule 203(g)(1)(A), insofar as such rules pertain to the use of coal as a source of fuel in residential and commercial buildings in the Chicago Major Metropolitan Area, or from (1) adopting or from (2) holding or conducting public hearings to adopt a rule which would eliminate or ban the use of coal as a source of fuel in residential and commercial buildings in the Chicago Major Metropolitan Area as such area is defined by the Illinois Pollution Control Board, unless there is a provision in said proposed rule for just compensation to owners of businesses in the class represented by plaintiffs and to owners of commercial and residential buildings whose property rights would be affected by said rule wherever said rule is effective.

And such further orders as may be entered by the Court.

Rule 204: *Sulfur Standards and Limitations*

(a) *Sulfur Dioxide Emission Standards and Limitations for New Fuel Combustion Emission Sources with Actual Heat Input Greater than 250 Million Btu per Hour.*

(1) *Solid Fuel Burned Exclusively.* No person shall cause or allow the emission of sulfur dioxide into the atmosphere in any one hour period fom any new fuel combustion emission source greater than 250 million btu per hour, burning solid fuel exclusively, to exceed 1.2 pounds of sulfur dioxide per million btu of actual heat input.

✻ ✻ ✻

✻ ✻ ✻

(c) *Sulfur Dioxide Emission for Existing Fuel Combustion Sources.*

(1) *Solid Fuel Burned Exclusively.*

(A) *Existing Fuel Combustion Sources Located in the Chicago, St. Louis (Illinois) and Peoria Major Metropolitan Areas.* No person shall cause or allow the

emission of sulfur dioxide into the atmosphere in any existing fuel combustion source, burning solid fuel exclusively, located in the Chicago, St. Louis (Illinois) and Peoria major metropolitan areas, to exceed 1.8 pounds of sulfur dioxide per million btu of actual heat input, on or after May 30, 1975.

*    *    *"

The 1967 regulations adopted by the Air Pollution Control Board, the predecessor to the Board in this State, ordered that the emissions of particulates from coal-fired generating units be limited to .6 pounds per million Btu of heat input. Apparently this was the first time that this State had set a limitation for particulate emissions. From the expert testimony at the hearings in this cause regarding the operation of centrifugal and electrostatic precipitators, which are used to control such limitations, we can infer that substantial sums of money had to be expended to comply with the 1967 regulations by either retiring the generating units or upgrading the collection efficiencies for the existing sources.

Rule 203(g)(1) would now place a further limitation on allowable particulate emissions, specifically, .2 pounds per million Btu of heat input. No prior rule limited the emissions of sulfur dioxide. Rule 204(a)(1), as enforced, would now limit emissions from new coal-fired generating stations to 1.2 pounds per million Btu of heat input, with Rule 204(c)(1)(A) limiting such emissions from existing coal-fired generating units in the Chicago and Peoria Major Metropolitan Regions to 1.8 pounds per million Btu of heat input.

Upon a complete review of the record, we are compelled to conclude that Rules 203(g)(1) and 204(a)(1) and (c)(1)(A) were not promulgated in accordance with the law and must be viewed as arbitrary and unreasonable.

There are but a few options that a generating source can employ to comply with both of these rules simultaneously. Although a total conversion from coal to natural gas or low-sulfur oil as the fuel supply might enable a source to comply with these rules, the Board itself recognized in its opinion that there is insufficient known supply of either of these resources to permit such a change now. Total conversion to nuclear energy is also not presently feasible. Therefore, coal must remain the principal source of energy for most of the electrical output users for the foreseeable future. In our view, the record fully supports Commonwealth's claims that there are only two options which could conceivably achieve compliance with both the challenged rules simultaneously: (1) the full conversion to the use of low-sulfur coal, which would satisfy Rule 204, combined with either the adoption of new, or

the remodeling of existing, electrostatic precipitators or other type of collection efficiency systems installed on the electrical generating units, which would meet the new particulate limitations set out in Rule 203; or (2) the continued use of high-sulfur coal and the collection efficiency systems programmed to that type of coal, which would meet Rule 203, combined with the use of removal processes, which would satisfy the requirements of Rule 204.

It is clear that the Board rejected the first option as a nonviable method of achieving compliance by the May 30, 1975, deadline. Several witnesses agreed that one of the most important factors affecting the rate of emission of particulates is the efficiency of precipitators and other cleaning equipment. This equipment is presently geared to the use of high-sulfur coal. A change to the use of low-sulfur coal would have an adverse effect on the collection efficiencies of the precipitators due to the fact that the ash in this type of coal would cause a high electrical resistivity. This fact was confirmed by a key witness for the Agency, Professor Lyon Babcock, who testified:

> "I did not include [the use of low sulfur coal] in my calculations. It is my understanding that the low sulfur coal will change the resistivity of the particles in the flue gas and decrease the collection efficiency of certain installed electrostatic precipitators. It is my personal feeling that electrostatic precipitators currently in use were rather well designed, developed, optimized for the specific coal that they were handling.
>
>       *    *    *
>
> Well, it would take admittedly significant developmental work * * *. Eventually, it would conceivably require quite an amount of redesign of the electrostatic precipitators, and the TVA has several things under development at the moment, investigating this specific problem." Record at 602.

Moreover, the testimony at the hearing regarding the apparent uncertainty of obtaining the needed amount of low-sulfur coal from the West as well as the great cost which may be involved in obtaining it also appeared to have had an effect upon the Board. As it stated at page 33 of its opinion:

> "Our standard is phrased in terms of pounds of emission per unit of heat input rather than in terms of sulfur content of the fuel, both to discourage resort to fuels of low sulfur content and low heating value that might pollute just as badly as that they replaced, and to allow for the use of equipment to permit the combustion of high-sulfur fuels by removing sulfur dioxide from the exhaust gas."

In focusing upon the installation of sulfur-removal devices contemplated by the second approach to meeting its two rules, the Board stated that enough evidence had been shown that the devices would work. It pointed out that a "number of firms" have constructed "sulfur control plants" which utilize "principles of sulfur oxide treatment * * * considerably beyond the laboratory stage"; that three full-sized units employing a wet limestone process had been constructed and operated in England prior to World War II; that a Swedish company had installed a similar unit on a hospital boiler that had operated for 6 months at a good removal efficiency percentage; that there are "existing demonstration projects" around the country "embodying various technologies"; and that manufacturers reportedly were prepared to sell sulfur-removal equipment and guarantee its compliance with the regulations. Yet, immediately after the above statements, the Board recognized that operating problems had been shown to exist in some of the systems and that the performance guarantees made by the manufacturers of the equipment were riddled with conditions. At one point in its opinion, the Board expressly recognized what had been stressed at the hearings: more information had to be accumulated and results of ongoing operations had to be tested and analyzed to determine the effectiveness of the systems.

■■ We do not believe that the legislature intended by section 27 that the Board would be limited by the technology of the sulfur-removal systems solely existent at the time of the adoption of its rules. (See *International Harvester Co. v. Ruckelshaus* (D.C. Cir. 1973), 478 F.2d 615.) However, to fulfill that statutory provision, there must be some factors to which the Board can point to show that its projection was reasonable and capable of compliance by a substantial number of the individual units in this State. Such evidence is absent in the present record. Again, Professor Babcock's testimony becomes relevant. While he stated that 60 to 70 approaches for controlling sulfur dioxide emissions were being explored, only 5 were considered to be processes sufficiently well developed and advanced within the cycle of development to be capable of providing or contributing to the control of sulfur dioxide emissions *within* the *next 5 years*. Yet the five processes—low-sulfur fuel, dry-limestone injection, wet-lime and limestone-scrubbing process, magnesium oxide process, and catalytic process—either had specific limitations or required further development. The hearings revealed that the principles of sulfur removal were known but that their application was not.

From our reading of the record, we are unable to state that the Board took into account the technical feasibility of these rules. In so ruling, we are not commenting on the wisdom of the rules. That is not our province. Without any evidence that the needed systems are beyond the

conceptually workable stage of development, it cannot be said that the Board's rules rest upon any evidence of statutory compliance. See *Incinerator, Inc. v. Pollution Control Board* (1974), 59 Ill.2d 290.

■■■ We further hold that there is no evidence that the Board took into account the economic reasonableness of these rules for a substantial number of the generating units in this State. The testimony at the hearings indicated the cost of the sulfur-removal systems would be great. Rather than presenting a formula indicating a balance between cost and pollution control or giving some concrete cost projections, the Board in its opinion offered general statements that there must be a "balancing [of] the benefits of the contemplated rule against its costs" and that greater costs may be needed to be absorbed "when the need for pollution abatement is greater."

■■■ This court, whenever possible, will approve actions taken by the expert administrative agencies in this State charged with the public trust to cleanse our environment. The advancement of productive human life and human welfare predominate over all other considerations. However, we must also scrutinize the actions of the Board to be sure that they comply with the statute and with reason.

■■ We recognize that possibly scientific evidence may have been developed since the hearing and the resultant Board opinion in this cause that may not demand a relaxation of these challenged rules. Accordingly, we remand this cause on this matter with instructions to the Board either to validate Rules 203(g) and 204(a)(1) and (c)(1)(A) in accordance with section 27 of the Act or to prepare proper rules as substitutes.

For all the reasons stated, the action of the Board in promulgating Rule 103(e)(1) is held valid. The enactment of Rule 303 is held to be void. The Board's adoption of Rules 203(g)(1) and 204(a)(1) and (c)(1)(A) is reversed and remanded for further consideration in accordance with the views expressed in this opinion.

Affirmed in part; reversed in part; reversed in part and remanded.

DEMPSEY and McGLOON, JJ., concur.