Docket No. 47352—Agenda 38—September, 1975.
COMMONWEALTH EDISON COMPANY, Appellee, v. THE POLLUTION CONTROL BOARD, Appellant.

*Opinion filed Jan. 20, 1976.—Rehearing denied March 25, 1976.*

CREBS, J., took no part.

William J. Scott, Attorney General, of Springfield (George William Wolff, Assistant Attorney General, of Chicago, of counsel), for appellant.

Richard E. Powell, Gerald D. Mindell, and Eugene H. Bernstein, of Chicago (Isham, Lincoln & Beale, of counsel), for appellee.

Wallace H. Johnson, Assistant Attorney General, and Edmund B. Clark and Larry G. Gutterridge, of the Department of Justice, Washington, D.C. (Robert B. Schaefer, Regional Counsel, Dorothy Attermeyer, Assistant Regional Counsel, U.S. Environmental Protection Agency, Region V, of Chicago, and John Bonjne and Jerome Ostrov, of the United States Environmental Protection Agency, Washington, D.C., of counsel), for *amicus curiae* United States Environmental Protection Agency.

Thomas Arthur, of Chicago (Daniel Swartzman, of counsel), for *amicus curiae* Chicago Lung Association.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

On April 13, 1972, under its docket No. R 71-23, the Illinois Pollution Control Board (hereafter the Board) filed an opinion and order adopting chapter 2 of its rules and regulations. Chapter 2 was divided into eight parts and contained both new rules and previously adopted rules which had been renumbered and reclassified. Common-

wealth Edison Company (hereafter Edison) was a party to the hearings held prior to adoption of the rules classified under parts I, II and III of chapter 2 (I — General Provisions; II — Emission Standards and Limitations for Stationary Sources; III — Air Quality Standards). Pursuant to sections 29 and 41 of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, pars. 1029, 1041) Edison filed a petition in the appellate court seeking review of Rules 103(a)(5)(b), 103(b)(6)(A), 103(e), 103(i), 104, 105, 111, 202(b), 202(e), 203(g), 203(i), 204(c), 204(h), and 303 of chapter 2. The appellate court affirmed the adoption of Rule 103(e)(1); held Rule 303 to be void; and reversed the adoption of Rules 203(g)(1) and 204(a)(1) and (c)(1)(A) and remanded with directions. (25 Ill. App. 3d 271.) We granted the Board's petition for leave to appeal.

This appeal is concerned only with the validity of Rules 203(g)(1), 204(a)(1), 204(c)(1)(A) and 303. Although the Board and Edison have briefed and argued a number of points, their contentions will be reviewed only to the extent necessary to the decision of this case. The United States Environmental Protection Agency and the Chicago Lung Association, pursuant to leave granted, have filed briefs as *amici curiae.*

We consider first the contentions of the parties concerning Rule 303, which provided:

> *"Nondegradation.*
>
> Existing ambient air quality which is better than the established ambient air quality standards at the date of their adoption will be maintained in its present high quality. Such ambient air quality shall not be lowered unless and until it is proved to the Agency [Illinois Environmental Protection Agency] that such change is justifiable as a result of necessary economic and social development and will not interfere with or become injurious to human health or welfare."

In its opinion filed at the time of adopting chapter 2 the Board stated:

"Rule 303: *Nondegradation,* embodies the principle, already found in Illinois air quality standards, like APCB rules and Reg. Ch. 5, and in water pollution regulations (SWB–7 through SWB–15; PCB Regs. Ch. 3, Rule 208), that parts of the State now clean shall not be unnecessarily degraded. This does not forbid all new facilities, as some seem to have thought. It requires Agency consideration, in advance of issuing a construction permit, to assure that degradation not justified by need will not occur and that new facilities are not put in the wrong place."

The appellate court stated: "To imply that the [Environmental Protection] Agency shall have the discretion to deny the application where the proposed facility would meet the requirements of the Act or regulations although lower the ambient-air quality essentially authorizes the Agency to create a new ambient-air-quality standard. Since it cannot be disputed that section 5(b) [of the Environmental Protection Act (Ill. Rev. Stat. 1971, ch. 111½, par. 1005(b)] clearly authorizes the Board to create such standards, the rule must be viewed as an attempt by the Board to delegate that duty to the Agency." (25 Ill. App. 3d 271, 279.) The court held that there was no legislative intent that the Board redelegate its authority to the Agency, that it was not empowered to do so, and that Rule 303 was void.

We do not agree that in adopting Rule 303 the Board delegated to the Agency its authority to establish ambient air quality standards. Ambient air quality standards were established in Board Rules 301, 302, and 304 through 312 of chapter 2, and Rule 303 does not purport to delegate to the Agency the authority to establish standards. The provision that if the existing ambient air quality was higher than that established by the Board's rules and regulations, the higher quality was to be maintained unless lowering it was justified by "necessary economic and social development and will not interfere with or become injurious to human health or welfare" was a directive to the Agency and did not serve to delegate to the Agency the authority

to set standards. In holding as it did, the appellate court erred, and that portion of its judgment must be reversed.

We consider next the contentions with respect to Rules 203(g)(1), 204(a)(1) and 204(c)(1)(A). These rules are contained in the opinion of the appellate court (25 Ill. App. 3d at 282-285) and need not be repeated verbatim here. Rule 203(g)(1) established particulate emission standards and limitations for fuel combustion emission sources using solid fuel exclusively. Rule 204(a)(1) established sulfur dioxide emission standards and limitations for new fuel combustion emission sources with actual heat input greater than 250 million BTU per hour using solid fuel exclusively, and Rule 204(c)(1)(A) established sulfur dioxide emission standards and limitations for existing fuel combustion sources located in the Chicago, St. Louis (Illinois) and Peoria major metropolitan areas using solid fuel exclusively. The order provided that Rule 204(c)(1)(A) was to become effective May 30, 1975.

The record shows that 83% of the fuel used to fire Edison's generating units was coal. These coal-fired units were designed for use with Illinois coal, which has a sulfur content of about 3.5% and a heating value of about 10,500 BTU. To comply with the sulfur dioxide emission limit in Rule 204(c)(1)(A), Edison would be required to use coal with a sulfur content of about 0.9%; and compliance with the sulfur dioxide emission limit in Rule 204(a)(1) of 1.2 pounds per million BTU for new coal-fired generating units would require it to use coal with a sulfur content of about 0.6%. Electrostatic precipitators which control particulate emissions, and which have been installed on most of Edison's coal-fired generators at a cost of $40,000,000, will comply with the 0.2 pound per million BTU particulate limit in Rule 203(g)(1), if Edison continues to burn the Illinois coal; but if low sulfur coal is used, these precipitators lose efficiency, and Edison would violate Rule 203(g)(1). It would take eight years to install new precipitators or rebuild existing precipitators for use with

low sulfur coal without interrupting service.

Omitting their many facts and figures, Edison's basic arguments may be summarized as follows:

1. There are not available sufficient quantities of natural gas, low sulfur oil or low sulfur coal to comply with Rule 204.

2. The present technology on sulfur-removal equipment is not adequate to allow Edison to use high sulfur coal and comply with the sulfur dioxide limits in Rule 204.

3. The emission limits set by the Board went beyond what was needed to achieve the Federal primary and secondary ambient air quality standards.

4. The Federal primary and secondary ambient air quality standards already have a built-in margin of safety over and above what considerations of health and welfare require.

5. It would cost between $1.9 billion and $2.7 billion over the lifetime of any equipment which could be installed to comply with Rule 203(g)(1) and Rule 204.

Section 27 of the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1027) provides that the Board, in promulgating regulations under the Act, shall take into account, among other things, "the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution." The appellate court held that the record failed to show that the Board took into account the technical feasibility and economic reasonableness of a simultaneous compliance with Rules 203(g)(1) and 204. (25 Ill. App. 3d 271, 287-88.) In remanding the cause to the Board for further consideration of these rules, that court stated:

"We recognize that possibly scientific evidence may have been developed since the hearing and the resultant Board opinion in this cause that

may not demand a relaxation of these challenged rules. Accordingly, we remand this cause on this matter with instructions to the Board either to validate Rules 203(g) and 204(a)(1) and (c)(1)(A) in accordance with section 27 of the Act or to prepare proper rules as substitutes." 25 Ill. App. 3d 271, 288.

The Board contends that the appellate court erred in holding that it had not, prior to the adoption of Rules 203 and 204, considered their economic reasonableness and technical feasibility. It is Edison's position that the evidence shows conclusively that it cannot in the foreseeable future comply with Rules 203 and 204 without shutting down many of its generating units resulting in "vast interruptions of service"; that because of technological deficiencies and the unavailability of reliable sulfur-removal equipment it is not possible to comply with the rules and that "The costs which would be imposed upon Edison and its customers in attempting to comply with Rules 203(g)(1) and 204 simultaneously are unreasonable in view of the minimal impact, if any, which compliance would have on ambient air quality."

*Amicus* United States Environmental Protection Agency argues that sections 27 and 5(c) of the Illinois Environmental Protection Act, and the Federal Clean Air Act of 1970 (42 U.S.C. 1857 *et seq.* (1970)), authorized the Board to "promulgate standards adequate to attain federal goals" and that "The Board's interpretation of 'technology forcing' as foreseen in the Clean Air Act, is correct."

On March 7, 1974, approximately 9 months prior to the filing of the opinion of the appellate court, the Board, under its Docket No. R 74—2 adopted the following order:

"The recent Arabian boycott of oil shipments to the United States has severely reduced supplies of heating oils, especially those of low sulfur content, to Illinois consumers. Natural gas supplies, a clean alternate fuel, appear to be relatively fixed in amounts available.

The Board in recent proceedings has been told that sulfur dioxide technology is not yet 'commercially available' for installation by large users of high sulfur coal or oil. On the other hand, the Federal government has maintained that the removal technology is available.

It seems desirable therefore to hold several inquiry hearings to determine among other matters the following:

1. The extent of available supplies of low sulfur fuels to Illinois.
2. The status of sulfur dioxide removal technology, especially for large heat sources.
3. The legal limits imposed upon Illinois by the Federal Clean Air Act (and any amendatory legislation to it) and by Court decisions on non-degradation so far as sulfur dioxide regulations are concerned.
4. The best up-to-date medical and public health opinion as to the validity of existing Illinois and Federal sulfur dioxide air quality standards and any developments toward different standards or, toward new related standards, such as sulfates or on synergistic effects with particulates, etc.
5. Regulations governing sulfur dioxide emissions or air quality standards which should be changed in light of the above.
6. Any new information on the costs of compliance with the regulations as they now stand or as they might be modified.

The Board welcomes public participation in these inquiry hearings and asks that persons interested in testifying make arrangements with the Hearing Officer.

IT IS SO ORDERED."

On January 9, 1975, as a result of these "inquiry hearings," a member of the Board proposed an amendment to Rule 204 which, subject to certain conditions, would exempt existing stationary sources from the numerical limitations of paragraphs (c), (d) and (e). In the statement of need attached to the proposed amendment the Board member said:

"Rule 204 was originally adopted by the Board on April 13, 1972. Said Rule was adopted along with all of Chapter 2. At the time of adoption, the best available

data was used in formulating the Board's rule. A summary of the Board's rationale used in adopting Rule 204 can be found on Page 36 of the Board's Opinion in that matter:

\* \* \*

On March 7, 1974, the Board issued its Order authorizing Inquiry Hearings, stating that it would be desirable to hold several inquiry hearings to gather information on several points relating to the sulphur dioxide question (see Order, March 7, 1974, R 74—2).

*The Inquiry Hearings were held on eight separate days and a wealth of new information was gathered. It is on the basis of information gathered that I realize the need for modification of the present Rule 204.* [Emphasis ours.]

In proposing the instant rule for hearing, the Board is in no way committed to the exact language or time frames incorporated therein. It is rather my intent to propose a first draft of what I feel is a warranted change when considering my obligations under the Environmental Protection Act.

I would urge participation of all parties in the comment period and regulatory hearings to follow.

Accordingly, I would request the full Board to act on this proposal and set it for public hearings as soon as possible."

By letter dated March 26, 1975, the Director of the Agency proposed amendments to Rule 204. The Board assigned the Agency proposal Docket No. R 75—5 and consolidated it with No. 74—2 for additional hearings. Edison stated in its brief that extensive additional hearings, then in progress on these two proposed amendments to Rule 204, should provide an adequate basis to evaluate the Rule. We note, however, from Environmental Register No. 112 of the Board, dated November 3, 1975, that "On a motion made by the Environmental Protection Agency, the consolidated hearings on R 74—2 and R 75—5, (amendments to the sulfur dioxide regulations), have been continued until further notice."

In addition to the proposed amendments to Rule 204 and the hearings thereon, Public Act 79—1099, effective September 26, 1975, added paragraph (r) to section 3 and

paragraph (h) to section 10 of the Environmental Protection Act. These paragraphs provide:

> "(r) 'Intermittent control system' is a system which provides for the planned reduction of source emissions of sulfur dioxide during periods when meteorological conditions are such, or are anticipated to be such, that sulfur dioxide ambient air quality standards may be violated unless such reductions are made."

> "(h) The Board shall adopt regulations prescribing the conditions under which existing fuel combustion emission sources may use intermittent control systems in lieu of compliance with sulfur dioxide emission standards. Such sources upon submission of proof that the use of a supplemental control system will not contribute to a violation of ambient air quality standards for sulfur dioxide, may utilize intermittent control systems, under such conditions as the Board deems proper, until December 31, 1985. Any source utilizing intermittent control systems pursuant to such Board regulations shall be in compliance with sulfur dioxide emission standards not later than December 31, 1985."

In view of the Board's order of March 7, 1974, directing new inquiry hearings on the precise issues we are here asked to consider, the extensive hearings that have been held and the "wealth of new information" that has been gathered in those hearings, and the recent legislation authorizing the use of intermittent control systems until December 31, 1985, under conditions prescribed by the Board in lieu of compliance with sulfur dioxide emission standards, we decline to determine the validity of Rules 203(g)(1), 204(a)(1) and 204(c)(1)(A) on the basis of evidence adduced at hearings held in 1970, 1971, and 1972 and the Board's opinion of April 13, 1972.

It does not appear that any enforcement proceedings have been instituted against Edison based on these rules in their present form, and the Board has granted Edison conditional variances from simultaneous compliance with the Rules. (See PCB 74–16, January 3, 1975.) Under these circumstances, the judgment of the appellate court revers-

ing the Board's adoption of Rules 203(g)(1) and 204(a)(1) and (c)(1)(A) is affirmed.

For the reasons stated, the judgment of the appellate court holding Rule 303 invalid is reversed, and its judgment reversing the adoption of Rules 203(g)(1) and 204(a)(1) and (c)(1)(A) and remanding for further consideration is affirmed.

*Affirmed in part and
reversed in part.*

MR. JUSTICE CREBS took no part in the consideration or decision of this case.