PEABODY COAL COMPANY, Petitioner, *v*. THE POLLUTION CONTROL BOARD, Respondent.

Fifth District No. 74-341

Opinion filed January 29, 1976.—Rehearing denied March 11, 1976.

6

Henry L. Pitts and Clifton A. Lake, both of Hackbert, Rooks, Pitts, Fullagar & Poust, of Chicago, for petitioner.

William J. Scott, Attorney General, of Chicago (Richard W. Cosby and Dennis R. Fields, Assistant Attorneys General, of counsel), for respondent.

Mr. PRESIDING JUSTICE KARNS delivered the opinion of the court:

This is a review of a decision of the Illinois Pollution Control Board, pursuant to the provisions of sections 29 and 41 of the Illinois Environmental Protection Act. (Ill. Rev. Stat. 1973, ch. 111½, pars. 1029, 1041.) Petitioner, Peabody Coal Company, seeks review in this court of certain water pollution control rules (hereinafter rules) adopted by Regulations R73-11 and R73-12, promulgated by the Illinois Pollution Control Board on August 29, and September 5, 1974.

The Pollution Control Board's (hereinafter the "Board") Regulations R73-11 and R73-12 (hereinafter "Illinois NPDES regulations") were adopted by the Board to enable the State of Illinois to administer, upon approval by the United States Environmental Protection Agency, the National Pollutant Discharge Elimination System (NPDES). The Board adopted the regulations in question in an attempt to satisfy the requirements of section 402(b) of the Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C. §1342 (1974 Supp.)) (hereinafter FWPCA), and thereby enable the State to assume permit granting authority for all discharges of pollutants from point sources into navigable waters within the State.

Prior to the adoption of the Illinois NPDES regulations, the General Assembly enacted certain amendments to the Environmental Protection

Act (Ill. Rev. Stat. 1973, ch. 111½, pars. 1013(b), 1039(b)) which were designed to enable the Board to adopt NPDES regulations and allow Illinois' participation in the NPDES.

Petitioner contends that the Illinois NPDES regulations are, in certain aspects, invalid insofar as they are inconsistent with the authority conferred upon the Board by applicable provisions of the Illinois Environmental Protection Act (hereinafter Illinois act) and in other respects unconstitutional as a denial of due process.

Prior to considering the substantive issues raised by the petitioner it is necessary to determine the appropriate standard for review of the Board's rule making function. The parties agree that the appropriate standard of judicial review of the Board's regulations is that "* * * administrative action taken under statutory authority will not be set aside unless it has been clearly arbitrary, unreasonable or capricious. [Citations.]" (*Illinois Coal Operators Association v. Pollution Control Board,* 59 Ill. 2d 305, 310, 319 N.E.2d 782, 785 (1974).) However, the parties disagree as to the factors which the Board must consider in promulgating its rules and regulations.

It is well settled that administrative agencies are limited to the rule-making power granted them by the legislature. (*Ruby Chevrolet, Inc. v. Department of Revenue,* 6 Ill. 2d 147, 126 N.E.2d 617 (1955).) Petitioner contends that section 13a of the Illinois act (Ill. Rev. Stat. 1973, ch. 111½, par. 1013a) requires the Board to follow the rule-making procedures detailed in section 27 of the Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1027), that section 27 specifies that the Board "take into account" technical feasibility and economic reasonableness in adopting substantive regulations and where the Board does not adequately consider these two factors, the regulations are invalid as arbitrary and unreasonable. (*Commonwealth Edison Co. v. Pollution Control Board,* 25 Ill. App. 3d 271, 323 N.E.2d 84 (1974), *aff'd on this issue,* 62 Ill. 2d 494, 343 N.E.2d 459 (1976).) The Board claims that the grant of power requiring it to adopt regulations for the purpose of allowing Illinois to implement and participate in the NPDES did not include a requirement to comply with section 27. The Board reasons that since the section granting its authority to promulgate NPDES regulations contains the following language, "[n]otwithstanding other provisions of this Act and for purposes of implementing an NPDES program" (Ill. Rev. Stat. 1973, ch. 111½, par. 1013(b)), that the Board does not have to comply with the requirements of" section 27. The Board's interpretations of the word "notwithstanding," however, do not comport with our understanding of the legislative intent in adopting this section.

■■ In our reading of section 13(b), "notwithstanding" refers to

other rules and regulations adopted under or required by the Illinois act, not to the requisite procedure for adopting these rules. Section 13(b) merely provides that regulations adopted to enable the State to participate in the NPDES program are to be enforced regardless of their possible inconsistency with other substantive regulations authorized by the act. It does not govern the manner in which these substantive rules or regulations are to be promulgated. Section 13a refers to the rule-making procedure and states that regulations are to be adopted in accordance with Title VII, which includes section 27. This interpretation is consistent with the procedure for promulgating standards under section 13(b)(i). The Board is given authority to adopt these standards by section 5(c) (Ill. Rev. Stat. 1973, ch. 111½, par. 1005(c)), which provides that these standards are to be promulgated in accordance with the rule-making procedures of Title VII (and section 27). Therefore, we believe that the Board must adhere to section 27 in adopting NPDES regulations.

■■ Section 27 provides that the Board "shall take into account" various factors, among which are the economic reasonableness and technical feasibility of the regulation. This phrase has been interpreted to require that the record show that the Board "concluded in promulgating the rules that it was technically feasible and economically reasonable for a substantial number of the individual emission sources in this state to comply * * *." (*Commonwealth Edison Co. v. Pollution Control Board*, 25 Ill. App. 3d 271, 281-82, 323 N.E.2d 84, 90 (1974), *aff'd on this issue*, 62 Ill. 2d 494, 343 N.E.2d 459.) We think that absent a conflict with the Federal requirements for participation in the NPDES program, the substantive regulations of the Board should be economically reasonable and technically feasible for a substantial number of individual emission sources in the State. But in view of the language of section 13b and the importance that the legislature attached to Illinois' participation in the Federal program, we believe that section 27 should not be read to require actual technical feasibility and economic reasonableness for a substantial number of emission sources within the State where that interpretation would imperil the State's participation in NPDES. Even in such a situation, section 27 would at least require that the Board fully consider these technical and economic factors. *Commonwealth Edison Co. v. Pollution Control Board*; cf. Currie, *Rule-making Under Illinois Pollution Law*, 42 U. Chi. L. Rev. 457, 459, 484 (1975).

After reviewing the FWPCA (33 U.S.C. §1251 *et seq.* (1974 Supp.)), it seems to us unlikely that the Board's consideration of technical feasibility and economic reasonableness would be inconsistent with Illinois'

implementation of and participation in the NPDES. The Administrator of the Federal Environmental Protection Agency is required to see that point source discharges of pollutants into navigable waters do not exceed effluent limitations representing the "best practicable [water pollution] control technology currently available" by July 1, 1977, and the "best available technology economically achievable" by July 1, 1983. (33 U.S.C. §1311(b)(1)(A)(i), (2)(a)(i) (1974 Supp.).) Congress "clearly intended to require step-by-step improvement in the quality of discharged effluent rather than a zig-zag course with total purity demanded forthwith, only to be succeeded by varying stages of impurity." *Stream Pollution Control Board v. United States Steel Corp.*, 512 F.2d 1036, 1043 (7th Cir. 1975).) Thus, we assume that until 1977 and 1983, respectively, the requisite technological standards need not be the "best" attainable. These goals, however, indicate that technological feasibility and economic reasonableness are primary factors in the promulgation of Federal regulations. Indeed, 33 U.S.C. §1314(b)(1)(A) and (B) (1974 Supp.), specifically directs the Federal Administrator to establish effluent limitation guidelines incorporating technological feasibility and economic reasonableness factors. Therefore, we can discern no problem with requiring the Board to follow section 27 of the Illinois Act in promulgating substantive effluent limitation regulations.

Moreover, the Federal act provides that "nothing in this chapter shall (1) preclude or deny the right of any State * * * to adopt or enforce * * * (B) any requirement respecting control or abatement of pollution." (33 U.S.C. §1370 (1974 Supp.).) The only qualification is that the states may not enforce limitations or standards which are less stringent than those adopted under Federal law.

Respondent does not point to any evidence in the record tending to establish the feasibility or reasonableness of Rule 410(b), challenged by petitioner, which provides:

> "No person may discharge any pollutant subject to, or which contributes or threatens to cause a violation of any applicable federal or state water quality standard, effluent standard, guideline or other limitation, promulgated pursuant to the FWPCA or the Act, unless limitation for such a pollutant has been set forth in an applicable NPDES permit. However, the Agency may, by permit condition, provide that the permittee may discharge pollutants present in its water supply intake sources in concentrations not greater than the concentrations in the intake sources, or which are added in trace amounts by normal domestic water usage."

This rule states that the discharge of any pollutant subject to Federal

or State regulation is unlawful unless the discharge is specifically authorized in a permit. A polluter is required to know what pollutants are subject to regulation, examine its discharge to determine the presence of any such pollutants, and then obtain a permit specifically authorizing the discharge of each pollutant discovered.

Respondent argues that industry testimony regarding the difficulty of identifying each "contaminant" present in its discharge is irrelevant because Rule 410(b) was revised to prohibit the discharge of "pollutants" rather than "contaminants." This argument implies that the board did not make the required considerations. Our task, however, is to determine whether there is sufficient evidence in the record from which the Board could conclude that the rule is feasible and reasonable. We have examined the record and are compelled to conclude that it contains insufficient evidence.

In its opinion of December 5, 1974, the Board explained that the purpose of 410(b) was to prohibit the discharge of any pollutant which might cause a violation of any applicable Federal or State standard unless the limitation for such pollutant was contained in a NPDES Permit. A Comment of the Illinois Environmental Protection Agency (hereinafter Agency), incorporated by reference into the Board's opinion, does contain some evidence of consideration of feasibility and reasonableness. The Agency stated, in support of its original proposed Rule 410(b) (which referred to "contaminants" rather than "pollutants"), that it recognized the difficulty in determining exactly what is present in a discharge, but concluded that the discharger is in a better position than the Agency to make such a determination.

An indication that the Board considered the feasibility and reasonableness of Rule 410(b) is an exchange between Board Chairman Dunelle and an Agency witness. Chairman Dunelle expressed concern that the rule would result in very expensive testing and monitoring requirements. The Agency witness responded that the Federal Environmental Protection Agency's treatment of the problem was to give polluters authorization to discharge pollutants not reasonably expected from a discharger in a particular industry. In a document submitted after the close of the hearings, the Agency stated that it planned to authorize expressly, by permit condition, the discharge of contaminants for which no specific limitations were included in the permit. Such a procedure would comply with the Federal regulation which requires State programs to prohibit discharges without permit authorization, but does not require specific authorization for each pollutant discharged. (40 C.F.R. §124.10 (1975).) If that were the Agency's and the Board's intention, it was not expressed in the language of Rule 410(b). That

rule specifically prohibits the discharge of a pollutant "unless limitation for such a pollutant has been set forth in an applicable NPDES permit." Rule 410(b).

The only evidence in the record which could support a conclusion that Rule 410(b) is technically feasible and economically reasonable is provided by Peabody Coal Company in its numerous references to its excellent monitoring and discharge analysis program which has been in operation since 1971 and which had resulted in a computerized reporting system containing an extensive body of information on mine drainage.

■■ While the only evidence in the record that Rule 410(b) is not technically feasible or economically reasonable is in the extremely general and conclusory complaints, unsupported by hard data, we must conclude that the record contains insufficient evidence to support a finding that compliance with the requirement of Rule 410(b) would be technically feasible and economically reasonable for a substantial number of dischargers within the State. Nor does the record indicate that adoption of Rule 410(b) is necessary to qualify Illinois for participation in the NPDES. We therefore hold that the Board in adopting Rule 410(b) did not comply with section 27 of the Illinois Act and that the rule is therefore invalid.

Peabody also contends that in promulgating Rule 410(b) the Board exceeded the scope of its delegated authority. The Board is required by section 13(b) of the Illinois act to adopt regulations which are "necessary or appropriate" for Illinois' participation in the NPDES consistent with the FWPCA and regulations. Section 12(f) of the Act prohibits the discharge of any "contaminant" [defined more broadly than "pollutant"; compare section 3(d) of the Illinois Act with Rule 104] without an NPDES permit, but further provides that "[n]o permit shall be required * * * for any discharge for which a permit is not required" under the Illinois Act and regulations. Peabody contends that Rule 410(b) is contrary to these provisions in that the rule goes beyond the FWPCA in requiring specific permit authorization for the discharge of any amount of a controlled pollutant. Petitioner argues that the Illinois NPDES regulations are more restrictive than the authorization to discharge pollutants contained in Federal and State statutes in that these regulations prohibit the discharge of any pollutant except to the extent authorized specifically by permit.

Specifically, petitioner argues that Rule 410(b) is invalid because it requires specification of every regulated pollutant and thus imposes burdens and restrictions not necessary to obtain Federal approval under the FWPCA. At the outset we do not believe that the Illinois act limits

the Board's rule-making power to that necessary to obtain a Federal permit. Section 13(b) requires the Board to promulgate regulations which are "necessary or appropriate" for Federal approval and which are "consistent" with the FWPCA.

Petitioner states that Federal permits contain a general authorization to discharge, subject to certain limitations on named pollutants, but that Illinois permits authorize the discharge of only those pollutants specified therein. The only requirements which are claimed to be too strict on polluters are monitoring and reporting of pollutants which exist in trace amounts or extremely low concentrations in a discharge. Peabody claims that under the FWPCA a polluter is not required to monitor and report such pollutants. Under sections 402(a)(1) and (b)(1) of the FWPCA, however, a permit issued by either the Federal or a State government must assure compliance with section 308 of the FWPCA which requires monitoring and reporting regulated pollutants. This contains a very broad grant of authority to the Federal Administrator to require such reporting "as he may reasonably require." 33 U.S.C. §1318 (1974 Supp.).

Thus it does not appear to us that Rule 410(b) is invalid as exceeding the authority delegated to the Board under the Illinois act. It does not contravene the restrictions of section 12(f) of that Act and is consistent with the FWPCA.

Additionally, petitioner argues that under Federal and State law no permit is required if, in fact, all applicable standards or limitations are met. This argument is based on section 301(a) of the FWPCA (33 U.S.C. §1311(a) (1974 Supp.)), which provides, "Except as in compliance with this section and sections 302, 306, 307, 318, 402 and 404 of this Act, the discharge of any pollutant by any person shall be unlawful." Only section 402 (33 U.S.C. §1342 (1974 Supp.)) relates to the permit program, and that section contains no express permit requirement. Therefore, according to Peabody, as long as the discharge complies with the applicable effluent limitations, and if no aquaculture project or dredging or fill disposal project is involved, no permit is required.

Peabody cites *United States v. GAF Corp.*, 389 F. Supp. 1379 (S.D. Tex. 1975), where the court stated that a polluter has a choice between complying with all established effluent limitations and complying with the conditions of a permit. The court held that since no applicable standards or limitations had yet been established, GAF had satisfied the former alternative and was not in violation of the FWPCA.

Under Peabody's proposed construction, and that approved in *GAF*, one needs a permit only to exceed an established effluent limitation.

This is an extremely narrow view of the permit system and is inconsistent with the history of the FWPCA and its underlying purposes and goals. Prior to the enactment of the FWPCA 1972 amendments, the Federal enforcement program was based on the Federal Water Pollution Control Act then in force and the Rivers and Harbors Act of 1899. The focus of the former was upon the quality of ambient water as affected by the discharge of pollutants. The Rivers and Harbors Act prohibits the discharge of refuse into navigable waters without a permit. (33 U.S.C. §407 (1970).) The purpose of the 1972 amendments was to change the focus of the enforcement effort from general water quality standards to specific effluent limitations.

We believe that the history of the 1972 amendments would indicate that the permit requirement is part of the Federal NPDES program. This conclusion finds support in *Natural Resources Defense Council, Inc. v. Train,* 396 F.Supp. 1393 (D.D.C. 1975), which enumerated important functions of the permit program other than as evidence of compliance with specific effluent standards.[1]

Viewing the NPDES as the successor to the permit program under the Rivers and Harbors Act (33 U.S.C. §407 (1970)) also supports our conclusion that a permit is necessary for one to discharge lawfully under the FWPCA. This section closely parallels section 301 of the FWPCA when read in conjunction with section 402 of the FWPCA in that both provide that to discharge is unlawful without a permit. In *United States v. Pennsylvania Industrial Chemical Corp,* 411 U.S. 655, 36 L. Ed 2d 567, 93 S. Ct. 1804 (1973), the Supreme Court held, notwithstanding the lack of an administrative program for permit applications and issuance, that to discharge without a permit was unlawful under the Rivers and Harbors Act.[2]

---

[1] As stated in *NRDC, Inc.,* the permit program identifies dischargers for the Environmental Protection Agency; puts the discharger on notice of its responsibilities; imposes enforceable compliance schedules; requires the discharger to monitor its own discharge and report to the Federal and State compliance agencies; and affords a simplified enforcement procedure. An additional purpose for the permit program is to allow imposition of effluent limitations prior to their formal adoption by the Federal Environmental Protection Agency, a means of enforcement unavailable under *GAF's* construction. See 33 U.S.C. §1342(a)(1) (1974 Supp.).

[2] For support of the position that a permit is required, see *The FWPCA Amendments of 1972,* 14 B.C. Ind. and Com. L. Rev. 672, 699-700 (1973); T. B. Arnold, *Effluent Limitations and NPDES: Federal and State Implementation of the FWPCA Amendments of 1972,* 15 B.C. Ind. & Com. L. Rev. 767, 775 (1974); J. P. Davis and R. J. Glasser, *The Discharge Permit Program under the FWPCA Amendments of 1972—Improvement of Water Quality Through the Regulation of Discharges from Industrial Facilities,* 2 Fordham Urban L. J. 179, 190 (1974); W. H. Romanek, *Water Quality Control: FWPCA Amendments of 1972—Federal Viewpoint,* 7 Nat. Resources Lawyer 225 (1974); *The FWPCA Amendments of 1972,* 1973 Wisc. L.

■■ Finally, notwithstanding the position of the Administrator in *National Resources Defense Council, Inc. v. Train,* any State participating in NPDES must have a statute or regulation prohibiting the discharge of pollutants except by permit. (40 C.F.R. §124.10 (1975).) For these reasons we reject petitioner's argument and decline to follow *United States v. GAF Corp.* We hold that Rule 410(b) is consistent with the FWPCA.

Peabody's final challenge to Rule 410(b) is that it requires pollutors to monitor and report on pollutants in extremely low concentration. Peabody argues that this requirement is beyond the police power of the State and is therefore unconstitutional.

■■ While the requirement may impose expense or inconvenience on petitioner, considering the evil to be corrected we believe the argument of so little merit. as not to require discussion. Merely because a regulatory statute requires substantial expenditures, it is not thereby rendered constitutionally infirm. (*Chicago Allis Manufacturing Corp. v. Metropolitan Sanitary District,* 52 Ill. 2d 320, 288 N.E.2d 436 (1972); *A. F. Staley Manufacturing Co. v. Environmental Protection Agency,* 8 Ill. App. 3d 1018, 290 N.E.2d 892 (1972).) One challenging an environmental rule or regulation so vitally concerned with public health and welfare bears a substantial burden of proof which petitioner clearly has not met. *Illinois Coal Operators Association v. Pollution Control Board,* 59 Ill. 2d 305, 319 N.E.2d 782 (1974).

Petitioner next attacks the constitutionality of Rule 909(h) of the Illinois NPDES regulations which provides that an NPDES permit shall become effective "when issued" by the Agency. Petitioner contends that the lack of a provision for an automatic stay pending appeal to the Pollution Control Board from a permit hearing before the Agency constitutes a denial of procedural due process. The petitioner asserts that it has a right to a "full dress" due process hearing before the permit becomes effective. The hearing before the Agency on permit applications is not such a hearing as it only provides the opportunity for the applicant or any person to submit oral or written statements and data concerning the proposed permit and the possibility of a public hearing.[3] Procedural due process does not attach unless one can demonstrate that he is being deprived of an "entitlement" by State action. (See *Bell v.*

Rev. 893, 896; see also *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 695 (D.C. Cir. 1975); *contra* M.D. Freeborn, *Illinois Environmental Law—The New Assault on Water Pollution,* 24 DePaul L. Rev. 481 (1975).

[3] It should be noted that the Board may grant a stay pending appeal from the Agency decision (Procedural Rule 308(i)) which would be sufficient to satisfy procedural due process under the rule in *Porter v. Investors Syndicate,* 286 U.S. 461, 76 L. Ed. 1226, 52 S. Ct. 617 (1932).

*Burson,* 402 U.S. 535, 29 L. Ed. 2d 90, 91 S. Ct. 1586 (1971).) Since Peabody is complaining only about the lack of a stay after the issuance of a NPDES permit, its claim is essentially that where a permit does not allow the discharge of pollutants permissible prior to the implementation of the NPDES program, it is being denied an entitlement. An applicant for an NPDES permit is not entitled by statute to a permit which allows the discharge of the same pollutants as under the unamended FWPCA. The enactment and applicability of a statute which supersedes and replaces a prior statute distinguish this case from *Goldberg v. Kelly,* 397 U.S. 254, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970). In that case the relevant statutory and regulatory standards were not changed but the dispute was whether the recipient was still eligible. That case and cases cited therein dealt with termination of an existing entitlement. We know of no case, and have been directed to none, which requires a due process hearing on the question of whether an applicant for a statutory entitlement should receive that which he requests.

While we are not convinced that Peabody possesses a statutory entitlement under the FWPCA or the Illinois EPA amendments or has demonstrated a riparian right to pollute or other protected interest, as it suggests, we will address the arguments regarding what process is due because of the importance placed upon them by the parties.

Initially we cannot agree with respondent's assertion that the permit process determines legislative facts and therefore no trial type hearing is required. (1 Davis, Administrative Law Treatise §§7.02, 7.03, 7.05 and 7.06 (1953 and 1970 Supp.).) "[A]djudicative facts are facts about the parties and their activities, businesses, and properties" while "legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." (1 Davis §7.02 (1953).) The permit process adjudicates facts which are peculiar to the individual applicant's "activities, businesses, and properties" and is beyond the policy-making stage.

It does not follow, however, that a permit holder is entitled to a "full-dress" hearing before a permit becomes effective. There is no precise rule which defines what procedure is constitutionally required. (*Morrisey v. Brewer,* 408 U.S. 471, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972).) We must weigh the interest of the State against the seriousness of the deprivation to the applicant in determining whether the procedural safeguards are adequate.

Peabody argues that the Supreme Court in *Opp Cotton Mills, Inc. v. Administrator of the Wage and Hour Division of the Department of Labor,* 312 U.S. 125, 85 L. Ed. 624, 61 S. Ct. 524 (1941), has established the rule which governs this case. The Court there said that in an ad-

ministrative proceeding procedural due process is afforded when the requisite hearing is held before the final order becomes effective. Thus, petitioner argues, Rule 909(h) is unconstitutional since the permit becomes effective before a due process hearing is held. We disagree. The hearing sanctioned in that case was not an evidentiary or adversary hearing, but merely one in which the agency "investigated" conditions in the industry. The hearing mandated by the Fair Labor Standards Act of 1938 was not of a quasi-judicial nature, but more of an investigative nature and was upheld as a sufficient hearing.

The procedure afforded by Rules 905 and 906 is similar. After the Agency makes a tentative determination whether to issue a permit, any interested persons may submit their views. The Agency must consider all such views, and if enough interest is evidenced, may hold a public hearing. Although this procedure is not a full adversary, quasi-judicial hearing, it grants prospective permit holders as much of a forum as was approved in *Opp Cotton Mills, Inc.,* before the respective orders are effective.

While we realize that absent an "extraordinary situation" procedural due process requires that notice and hearing be given before a person is deprived of an interest protected by the Fourteenth Amendment (*Fuentes v. Shevin,* 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983, (1972)), we believe that the significant governmental interest here involved outweighs petitioner's interest in a prior hearing. The primary purpose of such notice and hearing is to prevent the wrongful deprivation of a protected interest. In certain situations the hearing may be postponed if other safeguards are present. *Mitchell v. W. T. Grant Co.;* 416 U.S. 600, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974); *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 608, 42 L. Ed. 2d 751, 758, 95 S. Ct. 719, 725 (1975).

In the present case, Peabody's interests are not as compelling as those which were held superior to governmental interests in *Goldberg v. Kelley* (individual's need for welfare payments versus government's interests in fiscal economy) or *Wisconsin v. Constantineau,* 400 U.S. 433, 27 L. Ed. 2d 515, 91 S. Ct. 507 (1971) (avoiding unfounded public embarrassment or ridicule versus government's interest in proscribing one's consumption of alcoholic beverages). The personal interests advanced in *Bell v. Burson* present a closer question. In *Bell,* a motorist was deprived of his driver's license without a hearing because he had been involved in an accident. He neither proved he had liability insurance sufficient to satisfy an injured person's claim, nor did he post a bond. The driver's license there is arguably analogous to the NPDES permit here, and Peabody, like Bell, had possessed some license or per-

mit. This license could be essential to its "livelihood." *Bell,* however, is inapposite. The legislation attacked in *Bell* did not require all motorists to be financially responsible but only those involved in accidents, while here all individuals who maintain point-discharge sources into Illinois waters are subject to the NPDES permit requirement. Bell had a valid drivers license, while Peabody, of course, did not have an NPDES permit prior to the promulgation of Rule 410(b). Therefore, Peabody does not possess as compelling an interest as did Bell, Goldberg or Constantineau.

The government's interest in making permits effective when issued is great, as it allows the government to restrict the amount of pollutants being discharged into the waters of Illinois. This in turn promotes the State's interest in protecting the public health and environment. Without this requirement permit applicants could postpone a permit's effective date until all administrative and judicial appeals were completed, perhaps several years. Meanwhile, the petitioner is subjected only to the possibility of expending money to reach the level of discharges allowed by the permit. Petitioner has not demonstrated a sufficiently great hardship to outweigh the State's interest.

██ Since we believe that Rule 909(h) serves significant governmental purposes, requiring a hearing before a permit becomes effective would frustrate the interests served by the rule and since the action taken here is not initiated by private parties, we believe that Rule 909(h) does not violate petitioner's right to due process. The rules provide significant procedural safeguards. Permittees may make written and oral objections and may receive a hearing before the Agency before the permit is issued. Rule 909. As noted, a stay may be granted by the Board pending its review. We therefore hold that petitioner's argument is without merit and that Rule 909(h) is valid.

Petitioner next argues that the Board by adopting Rule 910(a)(6) has improperly delegated its rulemaking power to the Agency. We agree.

The Federal Water Pollution Control Act (FWPCA) provides that the Federal Environmental Protection Agency will promulgate regulations to define nationwide effluent standards, standards for performance, and limitations for the discharge of toxic substances. These standards are to be included as conditions in NPDES permits. (33 U.S.C. §1342(a)(1) (1970 Supp.).) Where the Federal standards and limitations have not been adopted State agencies may promulgate these regulations. (40 C.F.R. §124.42(a) (b) (1975).) The Illinois NPDES regulations provide, "(a) * * * the Agency shall impose such conditions as the Agency determines are necessary to carry out the provisions of the FWPCA." (Rule 910(a)(6).) This allows the Agency to establish ef-

fluent standards on a case-by-case basis because no Federal standards have been set.

██ It is a general rule that an administrative agency is not allowed to extend its statutory authority by its own administrative regulations. (*Illinois Bell Telephone Co. v. Commerce Com.*, 414 Ill. 275, 111 N.E.2d 329 (1953).) Under the Illinois act, only the Board is expressly given rule-making power, including the power to establish effluent limitations and environmental standards. (Ill. Rev. Stat. 1973, ch. 111½, pars. 1013 (a)(ii), 1005(b).) The respondent argues that section 39(b) of the Illinois act grants express authority to the Board to delegate directly to the Agency the authority to impose those conditions specified in Rule 910(a)(6). Section 39(b), however, states, "The Agency may include among such conditions, effluent limitations and other requirements established under this Act, Board Regulations, [and the FWPCA and regulations adopted thereunder]." It does not authorize the Agency to establish these standards. The court in *Commonwealth Edison Co. v. Pollution Control Board*, 25 Ill. App. 3d 271, 323 N.E.2d 84 (1974), held that a Board rule allowing the Agency to vary ambient air quality standards in certain cases was invalid as an unauthorized delegation of legislative authority. Although the Supreme Court reversed on this issue, holding that there was no delegation of rule-making authority in the rule there challenged (*Commonwealth Edison Co. v. Pollution Control Board*, 62 Ill. 2d 494, 343 N.E.2d 459 (1976)), we believe that in Rule 910(a)(6) a clear delegation exists and that the discussion and citations contained in the appellate court opinion on this issue are here appropriate and persuasive. We conclude that no express or implied statutory authority exists for the Board to delegate its rule-making power. While the Agency is given authority "to make recommendations" to the Board (section 4(j)), it is not given rule-making power; nor do we find that the General Assembly intended by implication to grant such authority to the Agency. We therefore find that Rule 910(a)(6) is an unauthorized delegation of the Board's authority and is invalid.

Petitioner next challenges Rule 902(c) which requires that mines with point source discharges comply with the State's NPDES permit program. It claims that the Board is required to exempt such mines from the program by section 13(b)(ii) of the Illinois act. That section states:

"Notwithstanding other provisions of this Act and for purposes of implementing an NPDES program, the Board shall adopt:

\* \* \*

(ii) Regulations for the exemption of any category or categories of persons or contaminant sources from the requirement to obtain any NPDES permit prescribed or from any standards or condi-

tions governing such permit when the environment will be adequately protected' without the requirement of such permit, and such exemption is *either* consistent with the Federal Water Pollution Control Act Amendments of 1972 (P.L. 92-500) or regulations pursuant thereto, *or* is necessary to avoid an arbitrary or unreasonable hardship to such category or categories of persons or sources." (Emphasis added.) (Ill. Rev. Stat. 1973, ch. 111½, par. 1013(b)(ii).)

Peabody contends that the permit required by part II, chapter IV (Mine Related Pollution) of the Board's rules is adequate to protect the environment and that the imposition of a dual permit requirement constitutes an arbitrary or unreasonable hardship. Under a literal reading of section 13b an exemption must be granted when these contentions are established. The respondent, however, contends that "or" in the section should be read as "and," because the granting of the exemption sought by petitioner is inconsistent with the FWPCA and its regulations. The Federal regulations clearly provide that mines with point source discharges must obtain an NPDES permit. (40 C.F.R. §§124.10, 124.11 (1975).) Exemption of such mines constitutes grounds for withholding approval for an entire State program. (40 C.F.R. §124.10 (agency comment) (1975).) While legislatures often confuse the word "or" with "and," and the General Assembly attached great importance to Illinois' participation in the NPDES, we believe that the respondent's argument must be rejected since the General Assembly used the word "either" in conjunction with "or."

■■ The record does not indicate whether the environment is adequately protected by the Mine Related Pollution regulations or whether a dual permit requirement is an arbitrary and unreasonable hardship. Thus, petitioner has failed to show that the adoption of Rule 902(c) is clearly arbitrary, unreasonable or capricious and its claim must be rejected on this record.

■■ Peabody's next contention is that Rule 910(1) is invalid in that its application, required by 40 C.F.R. §125.22(a)(6) (1975), would violate procedural due process since the required permit modification would occur without prior hearing. The parties affected, however, may participate in Federal hearings prior to changes in toxic effluent standards (33 U.S.C. §1317 (1974 Supp.)) and may seek judicial review of the adopted regulations (33 U.S.C. §1369 (1974 Supp.)). Further, the rule is procedural and thus section 27 of the Illinois act is not applicable. It is obvious, therefore, that petitioner is guaranteed procedural due process and that Peabody's constitutional argument is totally without merit.

Petitioner's final contention is that Rule 910(1) conflicts with the Illinois act and the FWPCA. The rule provides:

"Any NPDES permit issued shall include as a condition that if a toxic effluent standard of prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is established under Section 307(a) of the FWPCA for a toxic pollutant which is present in the permittee's discharge and such standard or prohibition is more stringent than any limitation upon such pollutant in the NPDES permit, the Agency shall revise or modify the permit in accordance with the more stringent standard or prohibition and shall so notify the permittee."

Under section 12(f) of the Illinois act and section 402(k) of the FWPCA, an NPDES permit holder is deemed in compliance with applicable standards except those relating to toxic pollutants "injurious to human health," if it meets the terms of its permit. Ill. Rev. Stat. 1973, ch. 111½, par. 1012(f); 33 U.S.C. §1342(k) (1975 Supp.)

Peabody contends that Rule 910(1) is inconsistent with these provisions. This position implies that Congress and the General Assembly, by expressly providing that compliance with a permit's terms does not insulate a permittee from penalties for noncompliance with standards for toxic pollutants injurious to human health adopted after the permit was issued, intended that an NPDES permit not contain a condition that the permittee comply with more stringent standards subsequently adopted for other toxic pollutants. We cannot adopt this interpretation as we believe it contrary to the congressional intent expressed in section 402(b) of the FWPCA.

Section 402(b) provides that a State enforcement agency must have authority "[t]o issue permits which—can be terminated or modified for cause including, but not limited to * * * change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge [before its NPDES program may be approved]." (33 U.S.C. §1342(b)(1)(C)(iii) (1974 Supp).) Congress and our legislature obviously attached great importance to the strict regulation of toxic pollutants injurious to human health and we do not believe that this concern precludes strict control of other toxic pollutants. ■■ The Federal regulations require a State plan to insure permit modification for all toxic pollutant standards. (40 C.F.R. §124.45(g) (1975).) Rule 910(1) provides what is necessary for Federal approval of Illinois' NPDES program. It does not abridge privileges granted under prior permits but only prescribes provisions to be included in particular permits. We conclude that Rule 910(1) is consistent with the FWPCA and the Federal regulations and therefore is authorized by sec-

tion 13(b) of the Illinois act. Ill. Rev. Stat. 1973, ch. 111½, par. 1013(b).

For the foregoing reasons, we affirm the Board's adoption of Rules 909(h) and 910(1) and further hold such rules valid. We also hold Rule 902(c) valid on the record before us. The Board's orders adopting Rules 410(b) and 910(a)(6) are reversed and the rules are held invalid and of no force and effect. The cause is remanded to the Board for further consideration of Rule 410(b), should the Board so desire, such consideration to be not inconsistent with the views contained in this opinion. Rule 910(a)(6) is void as an unauthorized delegation of rule-making power.

Affirmed in part; reversed in part; cause remanded with directions.

JONES and CARTER, JJ., concur.